[Civ. No. 14136. Second Dist., Div. One. Oct. 18, 1943.]

MARY M. SIMONET, Respondent, v. FRANK F. PELLIS-SIER & SONS, INC. (a Corporation), et al., Appellants.

Kenneth J. Murphy for Appellants.

Dee Holder and Samuel Marks for Respondent.

DORAN, J.—This is an appeal from a judgment in favor of plaintiff for the death of a minor son alleged to have followed from injuries sustained as the result of a collision between decedent, who was riding a bicycle, and a milk truck operated by defendant company.

Appellants' statement of the question involved is as follows. "Where the plaintiff's decedent was injured when he was knocked off a bicycle on December 5, 1941, and sustained minor injuries to his person, was the evidence sufficient to establish any proximate causal connection between the aforesaid injuries sustained on December 5, 1941, and the subsequent death of the plaintiff's decedent on April 15, 1942, it being conceded that insofar as the original injuries were concerned, the defendants were guilty of negligence which proximately caused the original injuries." Technically therefore, the question is, does the evidence support the findings. No other valid questions are raised by the appeal.

As noted in appellants' statement on appeal the accident occurred on December 5, 1941, and death did not ensue until April 15, 1942. The evidence reveals that decedent, who was 15 years of age, was taken to the hospital April 1st, at which time he was found to be actually ill with fever and suffering from chills. The autopsy report shows the cause of death to have been "septicemia with septic emboli to lungs, heart, and brain and purulent periostitis of the right femur." In the autopsy report, which is somewhat extensive, appears the following. "An incision into the soft tissue of the right thigh and the right hip region reveals the presence of a large quantity of pus, greyish-white in color, somewhat creamy in consistency in the muscle plane on the anterior and medial surface of the leg. The right hip joint and the right knee joint as well as the right ankle appear to have very clean uninfected surfaces. In the middle $\frac{1}{3}$ of the right thigh on the posterior aspect there is an area about $2\frac{1}{2}$ inches in length and perhaps an inch in width of roughened bone cortex and the purulent material in the right extremity appears to originate at this site. The bone marrow of the femur appears quite reddened and abundant." The record discloses in substance and effect that the focus of infection was revealed for the first time by the autopsy.

The extent of decedent's injuries as described by Dr. Wical, who attended him on the day of the accident, appears to have been some minor injury to the left ankle, which was "strapped" by the doctor, soreness in the left chest, the

shoulder and contusion of the left forearm and left side of the head.

Decedent's mother testified that she accompanied her son to the hospital following his injury where, she continued, "They tried to ease up his foot and put him in—I wouldn't know what to call it, a cast; but they called it, and it is some kind of tape that you can take off and on when you bathe his foot—heavy tape like plaster Paris. And they taped up his body and through his back and around in there (indicating), and before that they X-rayed. Q. What injuries did he suffer, so far as you could see? A. Well, at that time he was more concerned about his foot than anything, at that time; and then his elbow and throughout his body, on his hip and around down on his leg, he was brush burned considerably. At that time I didn't know they were brush burns —that's what the doctor said they were—scratches. Q. In other words, it is a scraping of the skin? A. Yes, like a deep cut, like he came in contact with something sharp. Q. He was given first-aid, was he, at the hospital? A. Yes. Q. Then what was done with him? A. Well, they told me to take him home and put him to bed, and he should be quiet. And so we took him home, and he was in bed for a number of days— I don't just remember how many days." She also testified to his condition thereafter and until he was taken to the hospital on April 1st, which, in substance was that he continued to suffer from the effects of the accident during this period, to some extent.

Four physicians, who testified for defendants, gave as their opinion that, as contained in appellants' "statement of question involved," there was no causal connection between the injuries sustained on December 5th and death which occurred on April 15th.

Dr. Hammond, witness for plaintiff, on the other hand disputed the opinion of defendants' experts and expressed the opinion that the injuries suffered on December 5th could and did cause decedent's death.

The court found as a fact that "as a direct and proximate result of the careless, reckless and negligent manner in which the said defendant, John Priem, did steer, guide, propel, operate and maintain said milk truck, causing the said milk truck to run against and upon the rear wheel of the bicycle operated by said Richard Robert Gerving, deceased, and which caused the said Richard Robert Gerving, deceased, to be violently thrown to the ground, and the said Richard

Robert Gerving, deceased, suffered injuries to his person, consisting of abrasions and contusions about the head, legs and body, and suffered sprains and bruises of his legs and body which caused the said Richard Robert Gerving, now deceased, to be confined to his bed for three weeks and four months later to-wit, on April 10th, 1942, to be hospitalized and placed under the care of physicians and nurses, and as a direct and proximate result of the abrasions, contusions and bruises suffered by the said Richard Robert Gerving, now deceased, the said Richard Robert Gerving, now deceased, suffered infection about his body and suffered septicemia with septic emboli to lungs, heart and brain and purulent periostitis of the right femur, which conditions resulted in the death of said Richard Robert Gerving on or about the 15th day of April, 1942;"

 Appellant complains on appeal that the hypothetical question asked of plaintiff's expert witness, Dr. Hammond, "fails to contain a fair statement of the evidence." In that connection it is urged, among other things, that the question propounded referred to "original injuries received by the boy on his right hip," when as a matter of fact, it is argued, that at no time was there any competent medical evidence of such an injury. It is not contended that objections were made at the trial and that erroneous rulings were prejudicial. Indeed the briefs contain no reference to the subject. And an examination of the transcript reveals that an objection to the question now criticized as failing to contain a fair statement of evidence, was withdrawn. In the circumstances, it is too late to raise such objections on appeal. Moreover, the record reveals that decedent's older brother testified to and described a bruise on decedent's right hip, to which his attention had been called and which he had seen on about January 6th.

 But appellants' principal contention appears to be that "the testimony of Dr. Hammond is not of sufficient substantiality to justify the court in concluding that there is any conflict in the medical testimony submitted in this case." In that connection appellants argue as follows: "Both appellants and respondent must have appreciated the significance of the rules respecting the necessity for the introduction of expert testimony. The *dramatis personae* of the medical cast which was before the court consisted of the following:" Then follows a brief summary of what each of defendants' experts testified to with appropriate reference to one who "specializes in orthopedic surgery," another who "is a prominent orthopedic surgeon," another as one who has been "for four-

teen years, chief surgeon of the Los Angeles County Receiving Hospital''; and another as ''an outstanding pathologist''; and concluding in part with, ''Last, but not least, we come to the concluding character, Dr. Nettie Hammond, who, in her best professional manner, says that these members of the medical profession are crazy and in her own word, 'nuts'.''

Thus, it is argued by appellants in substance that appellants' experts are eminent specialists in certain branches of the medical profession, whereas, quoting again from appellants' brief, ''By her own admission Dr. Hammond was only a gynecologist, i.e.: a doctor specializing in disease of the female organs.'' It is conceded that the cause of death was septicemia or blood poisoning. Nowhere in the briefs is it pointed out why one specializing in gynecology should be less qualified to express an opinion in such circumstances than another who specializes in some other branch of the medical profession. Nor indeed is it even urged that septicemia is a specialty. To the contrary it appears to be a subject of which all physicians would be expected to have a general and substantial knowledge.

Dr. Hammond testified at length and gave the reasons for her opinion. If reference by her to the other witnesses as ''crazy'' and ''nuts'' affected the weight of the evidence adduced by her testimony, the proper forum to present an argument to such effect was the trial court. █ Moreover, appellants can scarcely be heard to complain about the use of such language for it was the product of appellants' cross-examination and in reply to questions that clearly were argumentative and hence improper.

█ There is no merit to appellants' contention, therefore, that the evidence is lacking in substantiality to the extent that a question of law is raised for consideration on appeal. The trial court obviously accepted the testimony of plaintiff's expert as to the cause of death instead of the testimony of defendants' experts, five of whom testified in effect that there was no causal connection between the injury and the cause of death; in other words that the septicemia was not the result of the injuries caused by the accident. As to the probative value of such testimony, there can be no significance attached to the fact that the score was five to one. The court is not bound to decide in conformity with the declarations of any number of witnesses, which do not produce conviction in the mind of the court, against a less number

or against a presumption or other evidence. (Sec. 2061, Code Civ. Proc.) The testimony of the five witnesses for appellant was substantially the same and therefore cumulative; hence, if the trial court chose to reject the testimony of any one of such witnesses, of necessity the rest would likewise be rejected.

For the foregoing reasons the judgment appealed from is affirmed.

York, P. J., and White, J., concurred.