[Civ. No. 14239. Fourth Dist., Div. One. Feb. 20, 1976.]

COASTAL SOUTHWEST DEVELOPMENT CORPORATION,
Plaintiff and Respondent, v.
CALIFORNIA.COASTAL ZONE CONSERVATION
COMMISSION, Defendant and Appellant.

526

528

COUNSEL

Evelle J. Younger, Attorney General, Carl Boronkay, Assistant Attorney General, Anthony C. Joseph and Anthony M. Summers, Deputy Attorneys General, for Defendant and Appellant.

Daubney, Banche, Patterson, O'Neal, Nares & Reed, Daubney, Banche, Patterson & Reed, Nicholas C. Banche and Gilbert Nares for Plaintiff and Respondent.

OPINION

WHELAN, J.*—California Coastal Zone Conservation Commission (Commission) has appealed from a judgment mandating Commission to

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

grant a permit to Coastal Southwest Development Corporation (Southwest), petitioner in the proceeding in mandate, for construction of a nine-story Holiday Inn motel with 187 motel units, restaurant, coffee shop, meeting facility, and 250 parking spaces in the City of Oceanside (City).

The site of the proposed construction is on a bluff overlooking the sea in the general vicinity of the small boat harbor of City, toward the northern boundary of City, and the mouth of the San Luis Rey River north of which the property lies.

It comprises four parcels, three of them under a common ownership, for the purchase of which Southwest obtained an option on December 1, 1972. On June 6, 1973, Southwest entered into a conditional contract for the purchase of the fourth parcel from Sandman Motels, Inc. (Sandman). The total area of the four parcels was slightly over five acres.

Sandman had obtained a building permit from City prior to November 1972 for the building of a motel, and as provided in section 27404 had obtained a vested right to proceed with that construction. The southerly 40,000 square feet of its property on which it had originally planned to build a restaurant was the subject of the option.

The nine-story structure for which the permit was sought would occupy only 3.2 acres of the entire land acquisition, as Phase I of a total project; Phase II was planned as a "low profile" motor lodge. No permit was sought for Phase II.

The nine-story structure would rise 90 feet above the level of the bluff and its greatest horizontal dimension would be 120 feet, but that breadth pertained only to the lowest surface level of the proposed structure.

Commission was created by initiative measure approved by the electors November 7, 1972, embodied in Public Resources Code section 27000 et seq. Unless otherwise specified, all references by section number are to the Public Resources Code.

The project for the nine-story motel was approved six-zero, with one abstention, by the Planning Commission of City (Planning Commission) and unanimously by the Oceanside City Council (Council) (five members).

On June 28, 1973 Southwest filed an application for a coastal development permit under the Coastal Zone Conservation Act of 1972 (Act) with the San Diego Coast Regional Commission (Regional Commission). The application was approved August 3, 1973, by a vote of eight to one with one abstention.

On August 16, 1973 the State Commission received a notice of appeal from the Regional Commission's decision. On November 7, 1973 the State Commission denied Southwest's application by a vote of nine to three.

On December 31, 1973 Southwest filed a petition for writ of mandate. An alternative writ of mandate was issued to which Commission made a return by way of answer to the petition. The matter was heard on March 1, 1974, at which time the record of the earlier administrative proceeding was introduced into evidence.

In denying the application for permit, Commission had reversed the action of the San Diego Coastal Zone Commission granting the permit.

The proceeding before Commission was a hearing de novo. The superior court decided the matter upon the record of the proceedings before Commission, and took no new evidence. The function of the court, therefore, was to determine whether there was substantial evidence upon which Commission could find that Southwest had failed to show "(a) That the development will not have any substantial adverse environmental or ecological effect. (b) That the development is consistent with the findings and declarations set forth in Sections 27001 and with the objectives set forth in Section 27302."

Section 27001 declares:

"The people of the State of California hereby find and declare that the California coastal zone is a distinct and valuable natural resource belonging to all the people and existing as a delicately balanced ecosystem; that the permanent protection of the remaining natural and scenic resources of the coastal zone is a paramount concern to present and future residents of the state and nation; that in order to promote the public safety, health, and welfare, and to protect public and private property, wildlife, marine fisheries, and other ocean resources, and the natural environment, it is necessary to preserve the ecological balance of

the coastal zone and prevent its further deterioration and destruction; that it is the policy of the state to preserve, protect, and, where possible, to restore the resources of the coastal zone for the enjoyment of the current and succeeding generations; and that to protect the coastal zone it is necessary:

"(a) To study the coastal zone to determine the ecological planning principles and assumptions needed to ensure conservation of coastal zone resources.

"(b) To prepare, based upon such study and in full consultation with all affected governmental agencies, private interests, and the general public, a comprehensive, coordinated, enforceable plan for the orderly, long-range conservation and management of the natural resources of the coastal zone, to be known as the California Coastal Zone Conservation Plan.

"(c) To ensure that any development which occurs in the permit area during the study and planning period will be consistent with the objectives of this division.

"(d) To create the California Coastal Zone Conservation Commission, and six regional coastal zone conservation commissions, to implement the provisions of this division."

The objectives defined by section 27302 are these:

"(a) The maintenance, restoration, and enhancement of the overall quality of the coastal zone environment, including, but not limited to, its amenities and aesthetic values.

"(b) The continued existence of optimum populations of all species of living organisms.

"(c) The orderly, balanced utilization and preservation, consistent with sound conservation principles, of all living and nonliving coastal zone resources.

"(d) Avoidance of irreversible and irretrievable commitments of coastal zone resources."

We append such portions of the findings and declarations adopted by Commission in its denial of the application as are relevent to decision of this appeal.

The trial court found that as to certain matters found to be true by Commission as the bases for its decision, they were "based on speculation and conjecture, and accordingly" were "not supported by substantial evidence in light of the whole record." The matters so determined to be without substantial support are these: that the project proposed by petitioner could have an adverse cumulative effect on coastal zone resources; that petitioner's proposed project could have an adverse growth-inducing effect; that petitioner's project could have an adverse impact on the mouth of the San Luis Rey River and the area surrounding same; that petitioner's project could have an adverse effect on the physical, biotic and human systems within the coastal zone; that petitioner's project could have an adverse impact on views within the meaning of the California Coastal Zone Conservation Act; that petitioner's project could have an adverse impact on the visual appearance of the river and harbor areas; that petitioner's project could adversely affect the traffic circulation within the project area; and that petitioner's project could not be served by adequate sewer capacity. The trial court found also: "That there is substantial evidence in light of the whole record establishing the fact that petitioner's project does not have any substantial adverse environmental or ecological effects, and that petitioner's project is consistent with the findings and declarations of the California Coastal Zone Conservation Act as set forth in Section 27001 thereof and with the objectives set forth in Section 27302 thereof."

In fact a finding adopted by Commission is an affirmative finding that "the project does represent the loss of yet another significant area for viewing the harbor and ocean front." If the Marina Towers is built "the site of the proposed Holiday Inn would be the best remaining parcel for a public viewing area."

■ We have concluded that the findings of Commission are largely based upon opinion evidence of experts in the discipline of environmental planning. Such opinion evidence is substantial evidence upon which judicial or administrative decision may be based (*Simonet* v. *Frank F. Pellissier & Sons,* 61 Cal.App.2d 41 [141 P.2d 922]).

Among the materials submitted to and considered by Commission was the environmental impact report (EIR) prepared for Southwest in

connection with the applications it had filed with City and the Regional Commission.

That report opened with something in the nature of a warning:

"It seems evident from the information gathered and prepared for this report that the first thing necessary in discussing any long term mitigative measures is that the City of Oceanside engage in the preparation of an Environmental Impact Report on the entire growth trend that is primarily associated with development of the Small Craft Harbor.

"We feel the main responsibility for preparation of this Holiday Inn EIR—beyond the specific project consideration itself—is to point out the public action that could take place: to effect prior planning for future development, and initiate control over the development trend of which Holiday Inn is a substantial part.

"We suggest that the EIR be engaged in as a cooperative effort of the City and Harbor District in order to determine what effect the harbor has had, is having, and will yet have on the development of the tourist oriented areas of Oceanside.

"We suggest that the report be done in a spirit of cooperation with other agencies, including CPO, the San Diego Coast Regional Commission, Army Corps of Engineers, and others; but done as an Oceanside project. . . ."

It continued:

"[T]he direct, immediate impact of the Holiday Inn project on physical and biotic systems would be relatively minor, due to the nature of the project, the small land area involved, and the fact that the project site (except for the past six months) has been inhabited by man for many years.

"The project proposal also follows an established redevelopment trend in that area, and is fully consistent with the City's General Plan objectives.

"The major impact is seen in terms of secondary, or cumulative effects the project might have in continuing or accelerating a redevelopment

trend. Although the benefits of that trend toward more and better tourist facilities are sought by the City and the business community, its cumulative effect on physical, biotic, and human systems (including area economics) could be enormous."

It is not merely a matter of semantics that one who has the burden of showing that a certain activity will not have a certain effect does not do so by showing the activity could have that effect. Whether a finding it could have such effect is based upon speculation and conjecture is determined by the evidence supporting the finding that such an effect could result. The use of the language in the conditional present tense, in itself, does not compel the conclusion it is based upon conjecture and speculation; but the evidence must be considered.

In the proceeding before Commission, Southwest had the burden of showing that the proposed project would not have any substantial adverse environmental or ecological effect.

Southwest showed through its EIR as "unavoidable adverse effects":

"Some permanent visual impact is unavoidable by the nature of the project proposal. But given the present of Camp Pendleton and the present developed density of the area, it is not likely the impact will be seen to increase significantly as a result of further urbanization of north Oceanside.

"On-site effects are planned to be minimal. Some excavating will be required for the motel's lower level, but there is no need for extensive cut and fill. Developers claim—subject to final engineering—that no dirt will be hauled on or off the property, and that the bluff will be stabilized but not significantly altered.

"Unavoidable adverse effects beyond the project site itself should be minimal, and they should be (with one notable exception) within the control-realm of public policy.

"The adverse, and seemingly unavoidable effect that has received the least attention in context with Environmental Impact Reports is the taxation of project property and adjacent lands."

It showed also:

"The project would significantly alter percolation, runoff and erosion patterns, not altogether negatively. Percolation would be blocked over most of the land surface with construction of the motel tower, and the paving of roadways and parking areas. Runoff, however, would be increased to a large degree, requiring design attention. . . .

"   .   .   .   .   .   .   .   .   .   .   .   .   .   . .   .   .   .   .

"The Holiday Inn project would not result in a further encroachment toward the lagoon and its biotic systems in spatial terms, however, increased harrassment of wildlife might occur from a higher density of human population.

"It should be noted that many of the wildlife species found near the project site are fairly adaptable to an environment proximate to humans, as long as the human density and intensity of use is not too high.

"It would be difficult to predict either the quantitative or qualitative impact of Holiday Inn on the biotic systems of the lagoon and marsh, since increased use of that off-site area by patrons of the Inn cannot be guessed or projected. . . .

"   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"The potential human impacts of the Holiday Inn project are categorized as primary and secondary. The primary influences are those that are directly attributable to the project under consideration. The secondary influences, which can also be termed the cumulative effects, are those which might logically occur as a result of the project development and the trend it follows and supports. . . .

"   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Considering the project and its total effect on the community, it seems likely that the secondary, or cumulative impacts will be substantially greater than the primary. . . ."

At the hearings before Commission, there was an oral presentation of the opinions of Commission's staff to the effect "that the cumulative

effect of this and other projects in the area could adversely affect the valuable wildlife habitat at the mouth of the San Luis Rey River"; the staff witness stated, "the staff's concern was not that development in this area should be stopped, but rather that the development should proceed on the basis of firm plans, and firm commitments, to protect the wildlife values of the area. There is ample opportunity for development to proceed, but it should not be allowed, bit by bit, to obliterate the remaining valuable habitat in the area . . . that the proposed Holiday Inn site is potentially usable for public recreation, because it does afford good views of the harbor area . . . and there are clear problems with this site for public recreation, but because other and better sites have been taken for other uses, this is one of the best remaining."

Photographic slides of the area were shown. It appears from the administrative record that a staff member had visited the site and its surrounding area.

The written material prepared by Commission's staff and presented to Commission, showed: that the specific project for which the permit was sought was the first phase of a more embracing project of which the second phase would be a motor lodge; that the site was the best remaining bluff area for a public viewing area, whose value for that purpose was enhanced by its proximity to the public parking lot adjacent to the San Luis Rey lagoon; the loss of that best remaining viewing site would constitute an irreversible and irretrievable commitment of a valuable, diminishing coastal resource—vista points for viewing the harbor and ocean front area; they pointed out also the probable consequences to bird and other wildlife on the lagoon of an increasing density of human population resulting from continuing development toward the mouth of the river along both north and south banks, with respect to the probability of such consequences the staff report pointed out existing pressure which would be increased by further development, for a planned 40-foot roadway crossing the San Luis Rey River on an all-weather highway bridge that would disrupt the sensitive wildlife area at the river mouth.

■ Thus, there was substantial evidence that the proposed development would have an adverse environmental and ecological effect; and Southwest failed to show the project would not have such effect.

■ But the adverse effect as well as the evidence that shows the adverse effect must be substantial.

The question remains whether in the opinion of reasonable men the adverse impact in its various aspects is substantial as it must be under the statute.

The Environmental Quality Act (EQA) (§§ 21000 through 21174) is closely related in its general purposes to the Coastal Zone Conservation Act with which we deal. What was said in dealing with the EQA in *Plan for Arcadia, Inc.* v. *City Council of Arcadia,* 42 Cal.App.3d 712, 726 [117 Cal.Rptr. 96], is apposite here: "It is abundantly clear from the E.Q.A. (e.g., §§ 21083, subd. (b), 21090, 21100, subd. (g)) and the guidelines (e.g., §§ 15069, 15070, 15143, subd. (g)) that careful consideration must be given to the cumulative effect of projects proposed to be undertaken. The courts are enjoined to construe the statute liberally in light of its beneficent purposes. [Citation.] The highest priority must be given to environmental considerations in interpreting the statute [citation]. Its requirements cannot be avoided by chopping up proposed projects into bite-size pieces which, individually considered, might be found to have no significant effect on the environment or to be only ministerial."

Those considerations apply not only to the separate phases of an overall project but to any single project in relation to the conditions then existing and to conditions that would inevitably or probably result from accelerating or setting in motion a trend productive of adverse impact upon environment and ecology.

The study of town-planning, although well-established, is still a special subject. The study of environmental and ecological planning is a newer and an even less generally known specialty. As an effect of the Act, new criteria have been added for the guidance of the planners.

Economic utility and monetary value are not chief considerations for the permissible use of land within the purview of the Act. A use that might from the point of view of business practicability be a genuine improvement to a building site, increasing its market value and the market values of nearby property, may be ruled inconsistent with the policy declared by the Act.

In the earlier stages of the proceeding before the Commission it was not clear that the proposed 17-story Marina Towers, an apartment house or condominium, in the general area of Southwest's site would be

constructed. At the final hearing before the Commission counsel for Southwest stated Marina Towers was under construction, apparently under an exemption. It may be taken that was true.

That mention of the Marina Towers was an argument that a pattern was established thereby within which the proposed construction of the Holiday Inn would fit nicely.

■ Arguments based upon the predominant trend of development in an area sometimes persuade a planning or legislative body to hold, in effect, that the tail goes with the hide, so that a zoning variance is granted to another project that is consonant with that trend. Such arguments are addressed to the sound discretion of the authority passing upon the application.

Under the Act creating Commission, however, it may be just that last outpost that will make it possible to hold onto some of the values the preservation of which is the stated purpose of the Act. That is consistent with the concept that a site which represents a diminishing coastal resource is to be preserved and gives a stronger reason for its preservation as such resource. Such was the conclusion of Commission in its finding on the subject.

The means of preserving such values and an insight into the activities by which they may be endangered are probably not within the understanding and competence of the ordinarily prudent man who lacks special training in the subject.

■ In the absence of a challenge on constitutional grounds, the courts are not concerned with the wisdom of the legislation nor with measuring the value of its stated objectives against other values based upon economic and social considerations. Nor are we to be concerned with what may be the future of Commission or of the Act now that Commission's coastal zone plan has been filed with the Legislature. Under section 27650, the initial life of the Act is to expire January 1, 1977.

■ Where a vested right to proceed with a planned project does not exist under section 27404, the economic effect upon the landowner of a denial of a permit cannot be determinative of Commission's action.

Neither of the actual holders of title is a party to the present appeal, and Southwest's option in the one instance presumably was taken with

the knowledge a permit might be denied, and the contract to purchase was wholly conditioned upon the obtaining of needed permits.

■ For those and other reasons, the fact the property for which the permit is sought might find its highest and best economic use in the proposed development also is not determinative.

The Act provides for review of Commission's action in granting or denying a permit by mandate under chapter 2 of title 1 of part 3, Public Resources Code section 27424.

Code of Civil Procedure section 1094.5, rather than section 1085, was deemed the appropriate provision for the review of a permit denial by the state coastal commission (*State of California* v. *Superior Court* [*Veta*], 12 Cal.3d 237, 245 [115 Cal.Rptr. 497, 524 P.2d 1281]). "The purpose of section 1094.5 is to inquire into the validity of any *final* administrative order. The only final order in the present case is the denial of the permit . . . ." (12 Cal.3d 237, 245.)

Since the review is under section 1094.5, the standard for review by the superior court is whether substantial evidence supports the decision. ■ In the instant case the trial court properly determined that to be the applicable standard.

If "the . . . decision does not substantially affect a fundamental vested right, the trial court's inquiry will be limited to . . . whether . . . the findings are supported by substantial evidence in light of the whole record." (*Strumsky* v. *San Diego County Employees Retirement Assn.*, 11 Cal.3d 28, 32 [112 Cal.Rptr. 805, 520 P.2d 29].)

Here no vested right under the Act had vested; and, apart from the Act the same is true (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles,* 11 Cal.3d 506, 510, fn. 1 [113 Cal.Rptr. 836, 522 P.2d 12]).

Southwest has sought to raise by cross-appeal several procedural and due process issues which were rejected by the trial court.

■ Having obtained all the relief it sought, Coastal Southwest is not aggrieved by the judgment and is not in a position to cross-appeal (see *Ruben* v. *City of Los Angeles,* 51 Cal.2d 857, 864 [337 P.2d 825]; 6 Witkin, Cal. Procedure (2d ed.) p. 4118).

We observe, however: The notice of appeal from the action of the Regional Commission was received within 10 working days and was, therefore, timely (§ 27420, subd. (c)).

Whether the appeal raised a substantial issue is answered by the substantiality of the evidence upon which Commission based its decision.

■ Southwest had the opportunity to, and did, appear twice before the state Commission, argued orally on both occasions, and submitted extensive materials. There was no denial of due process.

■ Southwest, in writing, twice requested extensions of the time for hearing before Commission and, in writing, waived the requirement for decision within 60 days provided for by section 27423, subdivision (b). Southwest is estopped to raise the question of compliance with that section (*Klitgaard & Jones, Inc. v. San Diego Coast Regional Com.*, 48 Cal.App.3d 99, 111 [121 Cal.Rptr. 650]).

The judgment is reversed.

Ault, P. J., and Cologne, J., concurred.

A petition for a rehearing was denied March 9, 1976, and respondent's petition for a hearing by the Supreme Court was denied April 28, 1976.

---

*APPENDIX*

A. The Commission finds and declares as follows:
1. *Cumulative Effect of the Proposed Project and Other Current Developments on the Oceanside Coastal Zone.*
The major question posed by this proposed project is the cumulative effect on coastal zone resources of this project and other developments recently built, under-way, and proposed in the Oceanside area. In the immediate area of the project are located a Travelodge, a Sandman Motel currently under construction, three gas stations, and a restaurant. Immediately west of the project site is the proposed 17-story Marina Towers condominium project and to the southwest, across the mouth of the San Luis Rey River, is the 500-unit North Coast Village project exempted from the permit requirements of the Act. According to the applicant's EIR, "a 12-story apartment structure is proposed for a nearby harbor beach area" and "another similar structure is planned for the beach strand south of the harbor, within a mile of the Holiday Inn site." A recently completed condominium project is southwest of the project site in the area known as the Strand

(i.e., the strip development located immediately adjacent to the beach area) and the San Diego Regional Commission is currently reviewing a proposed project (56 units and 385 feet long) for the area between Tyson and First Street on the Strand. In the context of the current pace and scope of development in the coastal area of Oceanside, the Commission concurs in the EIR's conclusion that "the major impact is seen in terms of secondary, or cumulative effects the project might have in continuing or accelerating a redevelopment trend." As the EIR states, "although the benefits of that trend toward more and better tourist facilities are sought by the City and the business community, its cumulative effect on physical, biotic and human systems (including area economics) could be enormous."

a. *Growth-Inducing Effect.* The Holiday Inn could well serve as a catalyst to further rapid growth in the project area and southward. Construction of the project would certainly increase adjoining land values and the taxation of these parcels. According to the EIR, "in the case of the Holiday Inn (and the cumulative tax impact of other nearby projects), the remaining older land uses may be forced out by increased taxes before logical planning would suggest the need." The EIR further states that "the remaining land uses in the project area will be phased out by redevelopment within one to three years" and "that investment activity will spread southward from there." The manner in which current development and foreseeable development will affect coastal resources is examined below.

b. *Impact on the Area Surrounding the Mouth of the San Luis Rey River.* While the City states that traffic on Harbor Drive is at a current rate of 4200 ADT and is expected to increase only to 6,000 by 1980, these projections do not appear to take into account the major harbor expansion that is currently under review by the Army Corps of Engineers (see Exhibit 2). Moreover, the City's estimates do not appear to include the traffic to be generated by the 500 units in North Coast Village which even at the developer's extremely low estimates of 1880 ADT both ways would increase traffic on Pacific Street (which becomes Harbor Drive across the river) to 7736 ADT both ways. The realignment of Pacific Street around North Coast Village, combined with traffic to be generated by the Holiday Inn, Sandman Motel, Marina Towers and other future projects on the north side of the river mouth would certainly increase pressure for construction of a planned 40-foot roadway crossing the San Luis Rey River on an all-weather highway bridge. The sensitive wildlife area at the mouth of the river could thus be further disrupted by the impact of a bridge, built in response to the pace and scope of development in nearby areas. Moreover, with through-traffic already discouraged on the Strand and with proposals advanced to eliminate such traffic entirely, Pacific Street and Harbor Drive would become the primary routes for beach access. Cumulative traffic increases generated by built, approved, and planned projects indicate a strong possibility of overload on the Pacific Street-Harbor Drive beach access routes.

With development moving toward the mouth of the river along both the north and south banks, a basic concern is continuing vitality of the wildlife habitats nourished by the lagoon formed by the river mouth. One project has already been built in a flood-prone area at the mouth of the river (North Coast Village), and Oceanside has approved other projects located outside the coastal zone in flood plain areas. One consequence of current development for the river area is the rip-rap lining of the lagoon westerly of the railroad tracks discussed in the North Coast Village EIR. Both the EIR for the proposed project and for North Coast Village stress that the mouth of the river has abundant plant species which constitute an important waterfowl food resource and that many other species are supported by the diversity of plant and animal life in the area. The lands to the immediate south of the proposed project adjoining the river are in private hands. Increased land values resulting from the construction of the Holiday Inn and other developments in the area could cause further pressure for development of land on both sides of the river marsh area and subject important wildlife areas to the type of urban incursions represented by North Coast Village and the proposed bridge across the mouth of the river (an area known as a bird resting and feeding area).

Because of the regional significance ascribed to this portion of the San Luis Rey River, a preliminary draft of the San Diego Comprehensive Planning Organization's coast-line study has recommended that the "Oceanside General Plan, which designates the mouth of the San Luis Rey River as tourist oriented commercial, and the zoning ordinance (currently Residential Agricultural with potential for change to Recreation Commercial) should be re-evaluated" with regard to establishing strict environmental standards for development in the area and not building in flood plains (see Exhibit 3). Because no firm conservation plan has been developed for protecting these sensitive areas from human intrusion (both on foot and in concrete), the applicant's EIR states that "it would be difficult to predict either the quantitative or qualitative impact of Holiday Inn on the biotic systems of the lagoon and marsh, since increased use of that off-site area by patrons of the Inn cannot be guessed or projected."

The applicant has failed to carry its burden of proof of showing that the project will not in itself or cumulatively with other projects in the area have a substantial adverse effect on the river area under Section 27402(a) of the Act, and that the project will contribute to the orderly balanced preservation, consistent with sound conservation principles, of all living and nonliving coastal zone resources under Section 27302(c) of the Act.

c. *Impact on Views.* . . . [T]he project . . . does represent the loss of yet another significant area for viewing the harbor and ocean-front. Perhaps the best point for viewing the harbor is the site of the proposed Marina Towers project. If Marina Towers is built pursuant to its pending claim of exemption, the site of the proposed Holiday Inn would be the best remaining parcel for a public viewing area (its direct proximity to a public parking area further enhances its values for this purpose).

The significance of the viewing area can be better understood if placed in the context of the cumulative loss of ocean vistas resulting from other developments. The realignment of Pacific Street around the back of the North Coast Village project has deprived the public of a major scenic drive. Views of the ocean from Pacific Street above the Strand have been lost as new condominium projects rise above street level. This latter erosion of public vistas is particularly acute because Pacific Street is a major bikeway and because Pacific Street will become the main ocean front road if the Strand is ever closed. . . . Thus, the loss of the Holiday Inn site would constitute an irreversible and irretrievable commitment, under Section 27302(d) of the Act, of a valuable, diminishing coastal resource-vista points for viewing the Oceanside harbor and ocean-front area.

d. *Impact on the Visual Appearance of the River and Harbor Areas.* According to the Oceanside Planning Department Staff Report for the proposed project, "the pattern of high-rise structures has already been established in this area with the acceptance by the City of a 17-story apartment complex in the general vicinity of the Harbor." A 12-story apartment project has apparently been proposed for a nearby harbor beach area. However, the Sandman Motel under construction next to the proposed project is a low-rise development. According to the applicant's EIR, "with height as one aspect of growth-inducing impact, it is logical to anticipate that because of the Holiday Inn project, and others of its kind, there will be future proposals of a similar nature." The recently adopted height ordinance (see Exhibit 5) provides only vague standards for approving high-rises. The EIR proceeds to conclude that "their precise impact cannot be gauged, however, because the City has no specific plan or definition of the form and function they desire for this area, beyond the attitude that it is desirable to create and expand the tourist oriented economy." The EIR further states "because of that, the City cannot be fully aware of all the possible consequences of the trend, and has no specific guidelines for controlling it beyond a piecemeal consideration of private development plans." Without a specific design plan for the area adjoining the San Luis Rey River, it cannot be concluded that the project would contribute to the "maintenance, restoration,

and enhancement of the overall quality of the coastal zone environment, including, but not limited to, its amenities and aesthetic values" under Section 27302(a) of the Act.

B. *Need for Adoption and Implementation of a Specific Conservation and Development Plan for the Oceanside Coastal Area.*

Considerable discussion has taken place regarding the question of whether or not the City of Oceanside in fact has a plan for guiding and controlling development in the coastal area. The General Plan adopted by the City is a reasonably thorough document and espouses many positive planning principles. But the question that arises is whether the land-use designations and planning principles set forth in the General Plan provide the necessary tools for regulating the scope of development currently underway in the Oceanside coastal area. The City has stressed that the Oceanside master plan provides for the northern portion of the beach and harbor area to be devoted to tourist-oriented, commercial enterprises. But it is difficult to conclude that a 500-unit apartment complex and a 17-story condominium further this objective. The applicant's EIR states that "although the City and other agencies must participate in approving these projects as they come along, basically the trend is uncontrolled by any but the broadest of possible guidelines. The trend, so far, has been stimulated by the main forces of land economics, rather than by the deliberate application of community planning." Of particular significance is the fact that no conservation plan has been implemented for preserving the important wildlife areas along the banks of the San Luis Rey River. If the City commits its resources to the harbor expansion under review by the Corps of Engineers, the pressure for intense development of coastal land resources can only increase because Oceanside's harbor revenue resources will be even more limited for the expansion phase than they were for the original phase (i.e., while the normal harbor area ratio is one acre of land for each acre of water, Oceanside's harbor has only one-third acre for each acre of water to generate 50% of the revenues necessary to pay harbor district bonds).