[Civ. No. 21496. Third Dist. Mar. 18, 1985.]

JOSEPH F. LEWIS, Plaintiff and Respondent, v.
SEVENTEENTH DISTRICT AGRICULTURAL ASSOCIATION,
Defendant and Appellant;
CENTRAL STATE RACING ASSOCIATION, Real Party in Interest and
Appellant.

**[Opinion certified for partial publication.*]**

*See footnote 1, *post,* page 825.

COUNSEL

Shine & Browne, Shine, Brown & Diamond, P. Scott Browne and Raymond E. Shine for Defendant and Appellant.

Robert Eli for Real Party in Interest and Appellant.

Richard F. Ellers for Plaintiff and Respondent.

OPINION

REGAN, Acting P. In this case[1] we review the question of whether auto racing at a county fairground racetrack immediately adjacent to a residential area is categorically exempt from the California Environ-

---

[1]Pursuant to rule 976.1 of the California Rules of Court, all portions of this opinion shall be published except part III.

mental Quality Act (CEQA) and whether a county fairgrounds is a state or local agency for the purposes of reporting under CEQA. We conclude the fairgrounds is a local agency under CEQA, and that its auto racing activity next to a residential area is not categorically exempt.

Seventeenth District Agricultural Association (district association) and Central State Racing Association (racing association) appeal from a judgment issuing a writ of mandamus commanding the cancellation of a contract between them for auto racing at the Nevada County Fairgrounds. The writ was issued in response to an amended complaint contending the board of directors of the district association (district board) improperly found the fairgrounds racing categorically exempt from the requirements of the California Environmental Quality Act (CEQA), set forth in Public Resources Code section 21000 et seq.

Appellants contend it was error to issue the writ because the amended complaint was barred by the statute of limitations, and because auto racing at the Nevada County Fairgrounds is categorically exempt from CEQA. In issuing the writ, the trial court considered and resolved these issues in favor of plaintiff. We find no error in the ruling of the trial court, and uphold the issuance of the writ.

## FACTS

The Nevada County Fairgrounds are contiguous with and less than a mile from several residential areas in Grass Valley and unincorporated Nevada County. In 1958, the Nevada County Fair constructed a multipurpose arena, grandstand, and flat dirt race track for sporting events, including "stock" or "jalopy" auto racing at the fairgrounds. The district board leased the track for such racing until 1965. In 1973, a banked track was constructed permitting higher-powered "modified stock" car racing. Such races have been run by racing association since 1973, generally held every Saturday night from spring to fall. Racing hours were 6:30 p.m. to 12:30 a.m., but since 1976, due to complaints concerning the noise, the last race each evening was required to start before 11 p.m. There has been an increase in racing activity since 1973, resulting in greatly increased gross revenues.

In 1979, after plaintiff and other residents complained about the noise and dust, the district board appointed a committee to study the noise in the 1980 race year. As plaintiff wanted no racing in the 1980 racing year until an environmental impact report (EIR) was completed, he filed a complaint for damages, writ of mandamus and preliminary injunction on April 14, 1980, complaining that the expanded, modified stock car racing had been conducted since 1973 without any environmental review. In May 1980 the dis-

trict board required mufflers on all cars, and it prohibited any car which would produce more than 95 decibels of noise individually. The district board fined the racing association for various violations.

The original complaint attacked the 1980 contract between the district association and the racing association for racing to be held in the summer of 1980. While the action was proceeding to trial, the associations entered into a new contract for racing for the years 1981-1983, even though historically such contracts had been executed annually. After the inception of this suit and as part of the 1981-1983 contract, the district association filed a notice of exemption from CEQA requirements by asserting the racing was categorically exempt under the California Administrative Code, title 14, section 15323.[2]

Uncertain of its status as a state or local agency, the district association filed the exemption notice with the Secretary of the Resources Agency, as required by Public Resources Code section 21108 for state agencies,[3] and with the Nevada County clerk, as required by section 21152 for local agencies. The notice of exemption from CEQA was filed concurrently with the execution of the 1981-1983 contract on January 13, 1981. However, the Nevada County clerk put the notice in a box, and failed to post it with other such notices, as required by section 21152, subdivision (c).

On April 6, 1981, plaintiff filed an amended complaint, attacking the 1981-1983 contract between the district association and the racing association. In that amended complaint, he acknowledged the 1980 license to conduct auto racing was "completed," but he contended the controversy was "continuing in nature."

The trial court ruled the issues pertaining to the 1980 contract were moot. However, it also ruled the amended complaint related back to the filing of the original complaint, thereby making the attack on the 1981-1983 contract timely. Additionally, it ruled the amended complaint was not barred by any statute of limitations; that there was sufficient evidence to show plaintiff "furnished" the state Attorney General with the amended complaint; and that a categorical exemption from CEQA does not apply to this activity because the racing caused a potentially substantial adverse change in the environment. Therefore, the trial court ordered a writ of mandamus com-

---

[2]California Administrative Code, title 14, sections 15000-15387 contain guidelines for the implementation of CEQA, and shall be referred to herein as "CEQA guidelines." For discussion of individual sections, see *infra*.

[3]Unless otherwise indicated, all statutory references are to the Public Resources Code. This and other relevant sections are provided in discussion *infra*.

pelling the district board to cancel the existing racing contract until there was compliance with CEQA.

DISCUSSION

I

■ As the facts presented by the trial court are undisputed and the questions on appeal concern the interpretation of statutes and administrative regulations, we may draw our own conclusions of law from the facts. (*White v. Berrenda Mesa Water Dist.* (1970) 7 Cal.App.3d 894, 900 [87 Cal.Rptr. 338]; 5 Cal.Jur.3d, Appellate Review, § 529, at pp. 220-221.)

■ We first examine the merits of the CEQA compliance issue, and thereafter the procedural claims made by appellants. It is clear from the statutory scheme, and from the administrative guidelines supporting it, that the racing activity at the Nevada County Fairgrounds comes under the provisions of CEQA. The district association claimed it was exempt from CEQA because the racing activity was within one of several classes of activity categorically exempt pursuant to California Administrative Code, title 14, section 15323.[4]

The sole question is whether the categorical exemption is applicable to the normal operations of the Nevada County Fairgrounds racetrack. There are certain principal exceptions to the use of the categorical exemptions in the administrative guidelines. California Administrative Code, title 14, section 15300.2, subdivision (c), states: "[¶] A categorical exemption shall not be used for an activity where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances."[5]

The trial court included this guideline section in its notice of intended decision, but neither discussed it nor relied on it. As discussed below, it relied instead on the language of the categorical exemption itself. We, however, rely directly on this exception to the exemption, and we limit this

---

[4]At the time of trial, California Administrative Code, title 14, section 15323 was numbered 15123, and provided: "Class 23 consists of the normal operations of existing facilities for public gatherings for which the facilities were designed, where there is a past history of the facility being used for the same kind of purpose. Facilities included within this exemption include, but are not limited to, racetracks, stadiums . . . ." (Cal. Admin. Register 78, No. 5; 82, No. 2.)

[5]At the time of trial, the section was numbered 15100.5. Renumbering and amendment of sections within former article 8 (§§ 15100-15129), now article 19 (§§ 15300-15329), was filed July 13, 1983, effective August 1, 1983. (Cal. Admin. Register 78, No. 5; 82, No. 2.) Amendments are discussed in Notice Register 82, No. 28-Z, published July 14, 1982.

application of the exception to the "unusual circumstances" in this case, those concerning neighboring residences. Initially, we note there is no question of the existence of unusual circumstances—the adjacency of residential areas to the racetrack.

By finding themselves within the categorical exemption in CEQA guideline section 15323, appellants necessarily rejected the exception in section 15300.2. In reading the latter section it is necessary to construe the meaning of "significant effect on the environment." Public Resources Code section 21068 provides, " '[s]ignificant effect on the environment' means a substantial, or potentially substantial, adverse *change* in the environment." (Italics added.)

The trial court found the meaning of "change" to be change from 1970, the time of the enactment of CEQA. The evidence clearly shows a major change in the scope and degree of racing at the fairgrounds occurred after 1970, specifically in 1973, when the construction of a banked racetrack permitted auto racing at higher speeds and with greater noise and dust.[6] We conclude here the racing activity in question represents an adverse change in the environment,[7] and as such, it falls within the definition of "significant effect on the environment."

The trial court stated the district board concluded the 1981-1983 racing noise would not put them into the ambit of CEQA guideline section 15300.2, subdivision (c), exception to the categorical exemption. It then stated this decision was supported by substantial evidence, but only after the district association took mitigation steps. The trial court then went on to state the racing noise "may well have a significant effect on the environ-

---

[6]At oral argument, appellants requested this court take judicial notice of a change in CEQA guideline section 15323, concerning normal operations of facilities for public gatherings, where there is a past history of the facility being used for the same or similar kind of purpose. The Secretary of Resources added the following language: "For the purposes of this section 'past history' shall mean that the same or similar kind of activity has been occurring for at least three years and that there is a reasonable expectation that the future occurrence of the activity would not represent a change in the operation of the facility." (Cal. Admin. Register 83, No. 29, adopted July 16, 1983.) It is inappropriate for us to consider this language, as it (1) was not the language of the regulation at the time of trial; (2) it does not change our view of the applicability of the "unusual circumstances" exception to the exemption, nor does it provide a definition of "change" in the consideration of what is a significant effect on the environment; and (3) the district association and racing association may well have been sponsors of the proposed regulatory amendment during the pendency of the litigation. We will not base relief to any party on the basis of any regulatory re-writing pending an appeal. The regulatory change is prospective only. (CEQA guideline, § 15007, subd. (b).)

[7]Regardless of the question of "change," CEQA guidelines appendix G provides a "project will normally have a significant effect on the environment if it will: . . . (p) increase substantially the ambient noise levels for adjoining areas; . . ."

ment, but there is substantial evidence to the contrary." We do not rely on the ambiguous statement of the trial court. ■ "It is the validity of judicial action which is reviewable; not the opinion of the court or its statement of the reason for its action." (*Chichester* v. *Chichester* (1964) 228 Cal.App.2d 491, 499-500 [39 Cal.Rptr. 553]; citing *Southall* v. *Security Title Ins. etc. Co.* (1952) 112 Cal.App.2d 321, 323 [246 P.2d 74].) Therefore, we review the result in which the trial court found the categorical exemption did not apply, regardless of the reasons given.

■ It is the *possibility* of a significant effect on the environment which is at issue, not a determination of the actual effect, which would be the subject of a negative declaration or an EIR. Appellants cannot escape the law by taking a minor step in mitigation and then find themselves exempt from the exception to the exemption. The very fact the district association took steps in mitigation makes it manifest there was a possibility of a significant effect. If steps in mitigation lessen the "adverse change," such steps may qualify the district association to file a negative declaration, but not to find itself outside the law. Our reading of CEQA guideline section 15300.2, subdivision (c), together with Public Resources Code section 21068, indicates the district board would need to have found there was no reasonable possibility the noise would represent a potentially substantial adverse change in the environment. In fact, a district board resolution of March 11, 1980, admits *"possible* environmental effects include increased traffic congestion and noise [italics added]," but states these effects could not be determined until racing commences. Those possible effects were *in spite* of mitigation measures taken then, and subsequently written into the 1981-1983 license agreement.

The mitigation measures written into the 1981-1983 contract, together with an assertion that muffler requirements adopted in 1980 "perhaps lowered the overall residential noise by 10-20 decibels,"[8] do not establish that there is *no possibility* of any even *potential* adverse change since 1973, 1980, or since any previous summer racing season.

Section 21168.5 provides: "[a]buse of discretion is established . . . if the determination or decision is not supported by substantial evidence." There are no facts here to demonstrate that mitigation measures eliminated the

[8]Appellants offer that the maximum suggested decibel (dB) reading for residential neighborhoods is 55-65 dB, and lower for nighttime hours. In 1976, appellants state, noise generated by races measured in a nearby mobilehome park was 70-76 dB. After mufflers were required in 1980, the noise produced from each individual car (but not when several race at once) was reduced to less than 95 dB and "perhaps lowered the overall residential noise by 10-20 dB." We note 76 dB less 10 dB is 66 dB, still higher than the daytime maximum suggested reading.

*possibility* of any *potential* substantial adverse change in the environment. This record discloses no substantial evidence supporting the district board's implied or express decision to exempt itself from the exception to the exemption. It was an abuse of the district board's discretion to exempt itself from CEQA; with the adjacency of residential neighborhoods to the racetrack the "unusual circumstances" exception to the categorical exemption applies to its project as a matter of law.

If the district board determines the racing will have no significant effect on the environment after mitigation measures have been instituted, it may file a negative declaration. ■ It may use the opinion evidence of experts as substantial evidence on which to base such a decision. (*Coastal Southwest Dev. Corp.* v. *California Coastal Zone Conservation Com.* (1976) 55 Cal.App.3d 525, 532 [127 Cal.Rptr. 775]; citing *Simonet* v. *Frank F. Pellissier & Sons* (1943) 61 Cal.App.2d 41 [141 P.2d 922].) If it is unable to support that finding, it must prepare an EIR.

■ The trial court uses different reasoning to find the categorical exemption not applicable to this activity, construing the meaning of "past history" in the exemption. However, we do not rely on the trial court's reasoning. Instead, as noted above, we hold the "reasonable possibility of a significant effect" exception applies by its clear language, and the exemption, therefore, cannot. We do not decide whether the exemption in CEQA guideline section 15323 would apply to this racetrack activity absent the reasonable possibility of a significant effect on the environment due to the unusual circumstances.

## II

■ The district association contends the trial court erred in issuing the writ because the amended complaint was barred by the 35-day statute of limitations in Public Resources Code section 21167, subdivision (d),[9] and not a 180-day limitation provided therein. The trial court found the 35-day statute did not apply because, as a local agency, the district association was required to, and did, file its notice of exemption with the Nevada County clerk in order to invoke the 35-day statute, but the Nevada County clerk

---

[9]Section 21167, subdivision (d) provides: "[¶] Any action or proceeding alleging that a public agency has improperly determined that a project is not subject to the provisions of this division. . . *shall be commenced within 35 days after the filing* by the public agency, . . . of the notice authorized by subdivision (b) of Section 21108 [state agencies] or subdivision (b) of Section 21152 [local agencies]. If such *notice has not been filed, such action or proceeding shall be commenced within 180 days* of the public agency's decision to carry out or approve the project, . . ." (Italics added.)

did not post the notice as required by section 21152, subdivision (c).[10] The trial court ruled the 180-day statute of limitations applied therefore, and the amended complaint was timely.

The district association contends this ruling was error because the district association is not a local agency, but a state agency, which is required to file its notice of exemption only with the Secretary of the Resources Agency in order to invoke the 35-day statute of limitations.[11] Therefore, it was not required to file its notice of exemption with the county clerk for this purpose, and thus, the failure of the county clerk to post the notice did not destroy the 35-day statute of limitations.

The viability of the amended complaint, under these circumstances, depends on whether the Seventeenth District Agricultural Association is a state agency or a local agency for the purposes of CEQA. Food and Agricultural Code section 3953 states each such association is a "state institution." At the time of trial, neither the Public Resources Code nor the CEQA guidelines contained any definition of "state agency."[12]

The question whether the district association receives funds from the state treasury or its directors are appointed by the Governor will not determine how the district association should be regarded under CEQA. On the other hand, the history of the agricultural associations is useful in analyzing this issue. Under the 1849 Constitution, and an 1859 general law, there was unfettered legislative power to appropriate money to local private agricultural societies. (*People* v. *San Joaquin etc. Assoc.* (1907) 151 Cal. 797, 799 [91 P. 740].) "It became customary at every session of the legislature to pass laws appropriating money to the state agricultural society and to each of the several subordinate societies organized under the act of 1859."

---

[10]Section 21152, subdivision (c) provides: "[¶] All notices filed pursuant to this section [including notices of exemption from CEQA under subdivision (b)] shall be available for public inspection, and a list of such notices shall be posted on a weekly basis in the office of the county clerk. Each such list shall remain posted for a period of 30 days."

[11]Section 21108 provides in part: "(b) Whenever a *state agency,* board or commission determines that a project is not subject to the provisions of this division [as categorically exempt], . . . [it] may file notice of such determination with the *Secretary of the Resources Agency.* Any notice filed . . . shall have a certificate of determination attached to it issued by the state agency, board or commission responsible for making the determination that a project is not subject to the provisions of this division. . . ." (Italics added.)

Section 21152, subdivision (b) provides in part: "[¶] Whenever a *local agency* determines that a project is not subject to the provisions of this division, . . . [it] may file notice of such determination with the *county clerk* of the county, or counties, in which the project will be located." (Italics added.)

[12]CEQA guidelines were amended in July 1983 to include such a definition. However, CEQA guidelines section 15007, subdivision (b), also adopted in July 1983, states amendments to the guidelines apply prospectively only. Thus, we are not entitled to rely on the new section. Furthermore, the section is not especially helpful in determining the question.

(*Ibid.*) However, section 22 of article IV of the 1879 Constitution provided "that 'no money shall ever be appropriated or drawn from the state treasury for the use or benefit of any corporation, association, asylum, hospital or any other institution *not under the exclusive management and control of the state as a state institution, . . .*'" (*Id.*, at p. 800; italics in original.)

"[T]he next succeeding legislature, in 1880, enacted two laws; one declaring the state agricultural society to be a state institution, organizing the state board of agriculture and charging it with the exclusive management and control of the state agricultural society as a state institution (Stats. 1880, p. 212); the other, the act here in question, dividing the state into eleven agricultural districts, to be composed of certain named counties and providing for the organization of corporations therein, to be known as agricultural associations (Stats. 1880, p. 238)." (*Id.*, at p. 801.)

Thus, it is clear the organizing statutes enabled the formerly private district agricultural associations to continue receiving state funds by making them public corporations consistent with the language of the Constitution.[13] The language used to establish the district associations as *state* institutions was employed in order to distinguish them from *private* corporations which could not properly receive state funds. It does not mandate that each district is a state agency for the purposes of compliance with CEQA. Food and Agricultural Code section 3956 requires directors of the district association to be citizens and residents of the district. Section 3867 of that code provides that District 17 is the County of Nevada. The scope of the district association is county-wide only, its activities all of local significance. (See 3 Ops.Cal.Atty.Gen. 263-264 (1944).) The district board is self-governing and adopts its own resolutions, including the resolution of exemption in this case, without any control, approval or ratification from the state. Contracts require approval of the Department of General Services. (Food & Agr. Code, § 3965, subd. (d).) It may sue and be sued. (Food & Agr. Code, § 3954.) District associations may not be local agencies within the meaning of certain other codes, such as Government Code section 53090, subdivision (a). (See 56 Ops.Cal.Atty.Gen. 210, 215 (1973).) However, Government Code section 53090, subdivision (a), excludes cities and counties from being local agencies, whereas under the Public Resources Code, the CEQA guidelines include cities and counties as local agencies.[14]

---

[13]For history and text of former article IV, section 22, see 3 Deering's Constitutional Annotations (1974) at pages 380-384.

[14]Government Code section 23002 provides that counties are legal subdivisions of the state, mere governmental agencies of the state organized to exercise some functions of state government. (*County of Los Angeles* v. *Graves* (1930) 210 Cal. 21, 25 [290 P. 444]; *Wilkinson* v. *Lund* (1929) 102 Cal.App. 767, 772 [283 P. 385].) CEQA guideline section 15368 (numbered section 15031 at time of trial) provides counties are "local agencies" for purposes of CEQA.

As this court has previously noted, there is no inconsistency in finding a particular district may be considered a local agency for many purposes and for other purposes, a state agency. (*Galli* v. *State of California* (1979) 98 Cal.App.3d 662, 673 [159 Cal.Rptr. 721].)

We think the overriding consideration, for purposes of claims under CEQA, is notice. As the trial court found, "The entire reason for Public Resources Code § 21108b and § 21152b is to give notice. The district is a local agency in the sense that it acts solely in Nevada County. The major group of persons interested in its acts are in Nevada County. Thus, notice can best be given in Nevada County." We think this is sound reasoning.

We have held the clear objectives of CEQA can only be met if EIR's are filed in the county where the project is to be constructed and where significant ecological impact may occur. (*County of Inyo* v. *Yorty* (1973) 32 Cal.App.3d 795, 811 [108 Cal.Rptr. 377].) Similarly, a notice of exemption adopted by a district agricultural association must be filed in the district, not in Sacramento, in order to invoke a shortened statute of limitations. It would frustrate the purposes of CEQA to allow a district association removed from Sacramento to make decisions concerning activity happening solely or principally within that district, and then only file a notice of exemption from CEQA in Sacramento. To do so would require citizens who are interested in the enforcement of CEQA as it relates to their daily lives to monitor their local district at their own expense by continually reviewing the loose-leaf binder containing state notices in the Secretary of the Resources Agency's office in Sacramento. Such a requirement would make no more sense than permitting cities or counties to file such notices in Sacramento without doing so in their own offices.

In the instant case, citizens of Nevada County had no notice in their own county during the 30-day posting period that the district association had filed an exemption notice. The only apparent purpose of an entity filing notice would be to shorten the statute of limitations from 180 days to 35 days. Thus, because the mere fact of the filing is critical to actions attacking the entity's decisions, it is even more imperative the notice be filed and posted locally. (See *International Longshoremen's and Warehousemen's Union* v. *Board of Supervisors* (1981) 116 Cal.App.3d 265, 274 [171 Cal.Rptr. 875].)

Furthermore, with respect to CEQA, the Legislature has only defined "local agency," and not "state agency." Section 21062 states: " '[l]ocal agency' means any public agency other than a state agency, board, or commission. For purposes of this division a redevelopment agency and a local agency formation commission are local agencies, and neither is a state agen-

cy, board, or commission." The section makes no reference to other entities which are funded or controlled by a state agency, board or commission. For purposes of CEQA, we hold the district agricultural association is a local agency, and it must file a notice of exemption with the county clerk of the county, or counties, in which its project will be located.

We uphold the trial court's finding that the filing of the notice of exemption was required to be made with the county clerk, and because the notice was not posted pursuant to section 21152, subdivision (c), the 180-day statute of limitations applies. Thus, the filing of the amended complaint was timely.[15]

### III*

. . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The writ of mandamus is affirmed.

Evans, J., concurred.

**BLEASE, J.**—I concur in the judgment of the court affirming the issuance of an extraordinary writ. I differ expressly with the majority opinion because it offers no reasons for its conclusion that the project comes within an exception to the categorical exemption.

The majority opinion holds that the auto racing project requires an EIR because it comes within CEQA and within an exception, for unusual cir-

---

[15]The district association contends the trial court also erred in permitting the attack on the racing license renewal for 1981-1983 on the ground the amended complaint "related back" to the original complaint. We need not reach this question, as we hold the 180-day statute of limitations applies. We note, however, in the case of *repeated activity*, the demand for relief from one activity may soon become moot as part of a regular finish and renewal of the same activity. (See *Di Giorgio Fruit Corp.* v. *Dept. of Employment* (1961) 56 Cal.2d 54, 58 [13 Cal.Rptr. 663, 362 P.2d 487].) By disallowing an amended or supplemental complaint to allege the next racing agreement, the district association would be able to successfully avoid any legal attack on the resolutions and contracts by timing each new decision so that it would be moot before the issue gets to trial on the merits. The association could just as easily prevent consideration of future racing licensing renewals on the ground they would be premature. In such cases, an amended complaint should be allowed. (See also *Southern Counties Gas Co.* v. *Ventura Pipeline Const. Co.* (1971) 19 Cal.App.3d 372, 381 [96 Cal.Rptr. 825]; *United States* v. *W. T. Grant Co.* (1953) 345 U.S. 629, 632-633 [97 L.Ed. 1303, 1308-1309, 73 S.Ct. 894].)

*See footnote 1, *ante*, page 825.

cumstances, to the categorical exemption (from the EIR process) for projects which are part of the normal operations of existing public facilities designed and historically used for such operations. With this much I agree. But the majority bottom their determination that the auto racing project is within the exception wholly upon an assumption. They say that "there is no question of the existence of unusual circumstances—the adjacency of residential areas to the racetrack." But there is a question. What does the exception mean? How does it apply in this case? As to these questions, there is no answer. I will supply one.

Public Resources Code section 21084 authorizes the adoption of regulations which list classes of projects which have been determined not to have a significant effect on the environment. These are made exempt from the EIR guidelines. Section 21068 defines a "[s]ignificant effect on the environment" as "a substantial, or potentially substantial, adverse *change* in the environment." (Italics added; cf. *Wildlife Alive* v. *Chickering* (1976) 18 Cal.3d 190, 204-207 [132 Cal.Rptr. 377, 553 P.2d 537].) That makes the conditions of the environment which preceded the project the baseline against which to measure the adverse environmental change. (See *County of Inyo* v. *City of Los Angeles* (1981) 124 Cal.App.3d 1, 9-14 [177 Cal.Rptr. 479].) The exemption is thereby addressed to the categories of projects of which it can be said that they normally do not work an adverse change in the environmental conditions preceding the project.

Title 14 of the California Administrative Code implements this authority. Former section 15123 (now 15323) includes within the categorical exemptions "the normal operations of existing facilities for public gatherings for which the facilities were designed, where there is a past history of the facility being used for the same kind of purpose." (Former § 15123; Cal. Admin. Register 78, No. 5.) This provision depends, for its regulatory life, upon the determination that the "classes of projects" subsumed within the exemption categorically do not "have a significant effect on the environment . . . ." (Pub. Resources Code, § 21084.) Since a "project" includes any activity for which a permit is required (see Pub. Resources Code, § 21065), former section 15123 exempts from CEQA the "normal operations" of an existing public facility used for public gatherings which require a permit. The measure of the exemption is whether the operation (as to which the permit is sought) is one "for which the facilities were designed, where there is a past history of the facility being used for the same kind of purpose." Since this regulation seeks to implement CEQA it must be read to carry out its purposes. I turn to them.

The requirement that the facility must have been *designed* for the operation ("activity") for which the permit is sought ties in with the role that

CEQA plays in the review of the *facility* itself. CEQA requires that in the evaluation of the environmental effects of a facility, the effects of the *uses* ("operations," "activities") to which the facility is *to be* put must be evaluated. Thus if a permit is sought for a facility designed, as here, to be used as an automobile racetrack, CEQA requires that the environmental effects of the noise, traffic and other effects of that intended usage be evaluated. The purpose of the categorical exemption in former section 15123 now becomes apparent. It is aimed at preventing a duplication in evaluations. If there is no *change* in the uses to which the facility is put and which were evaluated at the time the permit for the *facility* was obtained, there can be no adverse environmental *change* which requires an evaluation. Thus when former Administrative Code section 15123 exempts from CEQA the "normal operations" of the facility for which it was designed and historically used, it exempts uses which have already been evaluated in the review of the permit for the facility. The additional requirement of former section 15123 that there be a "past history of the facility being used for the same kind of purpose" appears addressed to a lapse in the uses for which the facility was designed. Thus, notwithstanding that the environmental effects of the use were evaluated in the evaluation of the facility, if the uses have significantly ceased and there is no such "history" the categorical exemption does not apply. If the environmental effects of high speed automobile racing were evaluated at the time the facility, designed for such use, was authorized, and those uses have continued, there is no sensible purpose in duplicating the environmental evaluation on each occasion that the facility is similarly used.

However, former section 15123 does not express the policy which justifies its existence. Standing alone, its language conflicts with CEQA. However, it does not stand alone. There is an exception broad enough to encompass the CEQA policy. Title 14, section 15300.2, subdivision (c) of the California Administrative Code says there can be no categorical exemption "for an activity where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances." I take that to mean that the unusual circumstances must be of the kind that would produce an adverse change in the environment from that encompassed within the evaluation of the designed uses of the facility. That dovetails with the requirement that the exempted activity be a "normal operation" of the facility, i.e. one for which it was designed and historically so used. The "unusual" thus predicates a change in the effects of the "normal operations" as evaluated in an EIR which involve an adverse *change* in the environmental impact of the operations of the facility. It follows that the claim of categorical exemption must be supported by a showing that the project for which the exemption is sought was of the kind included within the EIR issued at the time the facility was evaluated for its designed uses.

Otherwise, the usual circumstances which justify the categorical exemption would not obtain.

That brings us to this case. The facility was designed in 1958 for automobile racing. It was modified in 1973 to permit the kind of high powered "modified stock" car racing which is the subject under review. The pertinent question to ask is not whether that racing is "unusual" given the present environment but whether the facility, as built or modified, was designed and historically used for such racing, was the subject of environmental review of that use at the time it was reconstructed and whether there has been an adverse change in the environmental circumstances following the construction of the facility. I note that CEQA was in effect in 1973 when the track was banked for high speed racing. That should have subjected the project to environmental review of the uses for which the racing permits are now sought. There is nothing in the record to show that this was done. It is the burden of the applicant for the exemption to show that the conditions for the exemption have been met. Since the uses of the facility were not evaluated at the time the facility was reconstructed for high speed racing in 1973, the categorical exemption for such subsequent uses cannot be applied.

Appellants' petition for review by the Supreme Court was denied May 29, 1985.