[Civ. No. 17809. Third Dist. Nov. 13, 1979.]

BRUNA GALLI et al., Plaintiffs and Appellants, v.
THE STATE OF CALIFORNIA, Defendant and Appellant.

**Counsel**

Desmond, Miller, Desmond & Bartholomew, Richard Desmond, Belli & Choulos, Melvin M. Belli, Thomas J. LoSavio, Buchman, Kass, Morgan & Miller, Kenneth Miller, Nichols, Williams, Morgan & Digardi, Edward M. Digardi, James Garlock, Siegfried Hesse, Dodge, Reyes, Brorby, Randall & Titmus and Robert P. Brorby for Plaintiffs and Appellants.

Evelle J. Younger and George Deukmejian, Attorneys General, Robert L. Bergman, Assistant Attorney General, John M. Morrison and Thomas K. McGuire, Deputy Attorneys General, for Defendant and Appellant.

**Opinion**

**REGAN, J.**—This case arose from the 1972 massive flooding of Brannan-Andrus Island in the Sacramento-San Joaquin delta (commonly known as the Isleton flood), resulting from failure of a levee on the San Joaquin River.

### Liability Disposition of the Case in Trial Court

A class action was filed against the State of California (state), the Brannan-Andrus Levee Maintenance District, and the County of Sacramento (county). Plaintiffs are approximately 650 individuals,

corporations and other legal entities whose properties were allegedly damaged by the flood waters.

The case was tried before a jury and special verdicts were rendered finding the Brannan-Andrus Levee Maintenance District liable based on both inverse condemnation and government tort liability. The jury found in favor of the county.

With respect to the state, appellant herein, the jury returned a special verdict finding the state did not substantially participate in the work of public improvement by the district of the failed levee and therefore the state was not directly liable for inverse condemnation.

However, by special verdict the jury did find the state directly liable for government tort liability based on its failure to perform a mandatory duty. This latter finding was made after the court had determined, as a matter of law, (a) the state had a mandatory duty to review and approve or disapprove the plans of levee work of the Brannan-Andrus Levee Maintenance District before any work was done, and (b) the district was an "agency of the State of California" and liability of the district for inverse condemnation and for tort was therefore the liability of the state. The jury was instructed that provisions of the Water Code required the State Reclamation Board's prior approval of any construction or maintenance work on a levee and prohibited the doing of any work without the board's permission, and that since it was admitted the state failed to comply with such mandatory duty, it was the function of the jury to determine whether such failure was a proximate cause of the damage to the plaintiffs. As to the district being an agency of the state, the jury was expressly informed the court would make this determination and the jury would not make a finding on that point. Assuming the jury followed the court's instructions, the liability of the state established by the special verdict of "failure to perform a mandatory duty" was based on a finding such failure was a proximate cause of the injury to plaintiffs. Moreover, since the court had found the district to be an agency of the state as a matter of law, the special verdict of the jury finding the district liable would also render the state directly liable (for an act of one of its agencies), as indicated by the special and general verdicts and by the judgment from which the state now appeals. The ultimate result was a general verdict against Brannan-Andrus Levee Maintenance District (from which it did not appeal) and a general verdict against the state, which led to the judgment from which the state here appeals.

## Liability Issues On Appeal

There are two major issues raised by the state insofar as *liability* is concerned. These are: (a) whether the state (acting through the State Reclamation Board) was under a mandatory duty to review and approve or disapprove the Brannan-Andrus Levee District's plan or work before the work was allowed to commence and, if so, whether failure to require submission of the plan and to review it could constitute a proximate cause of the injuries suffered; and (2) whether the district is a state agency for whose acts and omissions the state is liable.

## Damage Disposition of the Case in Trial Court

Upon their motion, the actions of three of the many plaintiffs were severed from the class action for purposes of trial of damage issues, on the grounds the facts and circumstances of their damages were unique and different from other members of the class.[1] This portion of the action was tried before a different trial court and jury. Several rulings made by the court before the case went to the jury have become damage issues on this appeal by the state. They are the following:

The trial court was confronted with the questions whether plaintiffs were entitled to pursue aggregate damages under theories of inverse condemnation and tort or were required to elect recovery under one theory. Over objections, the trial court ruled plaintiffs could proceed as to damages under both theories and could aggregate their items of damages, so long as there was no duplication of items.

The trial court ruled concerning the date of valuation of property for purposes of damages. Over defense objections, the court allowed evidence to go to the jury of valuations of certain lost or damaged properties in terms of 1973 dollars and in terms of 1978 dollars, i.e., the jury was allowed to consider the rate of inflation.

The trial court ruled, over objections, that evidence was admissible showing emotional distress of Marjorie Gemignani as an element of recoverable damages. The state challenges this ruling as error.

---

[1] These plaintiffs are Bruna Galli, Richard Gemignani and Marjorie Gemignani.

## The Cross-appeal

Plaintiffs have cross-appealed from the order of April 27, 1978, which was the same day as the judgment denying recovery of litigation costs and attorney's fees, pursuant to Code of Civil Procedure section 1036. They have also appealed from that portion of the judgment which reflects the trial court's order that damages are to be reduced by the amount of nonreimbursable federal disaster benefits received by them.

## Facts

During the early morning hours of June 1, 1972, a levee failure occurred on the southern portion of Brannan-Andrus Island along the San Joaquin River in the Sacramento-San Joaquin delta area, resulting in the flooding of thousands of acres of agricultural and other land and portions of the City of Isleton.

Prior to the levee failure, work was in progress to raise subsided portions thereof and to widen its crown. The work was being done by the Brannan-Andrus Levee Maintenance District, created by the Legislature by special act in 1967 (Stats. 1967, ch. 910). The district board was interested in using the least costly method and that which would take the county road on the levee out of use for the shortest period of time. George Raab, civil engineer, was hired to develop plans and direct the repair and restoration work.

There were alternative methods that might be employed to restore the levee: material could be dredged from the adjoining channel, deposited behind the levee and when sufficiently dry moved up to raise and shape the levee crown; the dredged material could be deposited directly on the levee crown, and when sufficiently dry, placed as needed to achieve the necessary levee elevation; material could be imported from borrow sites by truck and placed on the levee; material could be taken from the land at the base of the inside of the levee to raise and shape the levee crown and then this material be replaced by dredged material from the adjacent channel. The first two methods had the disadvantage of requiring an extended period of time for the material to dry and were not utilized by the district.

In addition to raising the subsided protions of the levee crown to a uniform grade the district was widening the crown to allow for a wider

county road. This required obtaining some 30 percent more material than would have been needed solely for restoring the levee.

No plans setting down the specific method of work in 1972 were made by the district. That year material for repairing the levee was obtained partially from the channel and partially from the landside of the levee. The levee was cleared of trees and brush and dredged material from the channel was placed on the waterside of the levee to raise and extend the crown waterward. Material was bulldozed from the land at the base of the inside of the levee and placed on the crown. This material was to be replaced immediately afterward by material dredged from the channel. The levee failed before the replacement occurred. Borrowing material from the field on the landside of the levee had been done on the stretches of levee worked on by the district in previous years without incident. The method had also been utilized by Raab on other delta levee work without untoward results.

No evidence of levee failure had been seen at the close of work the evening before the breach or by passersby later in the evening. No witness to the levee failure was produced. However, several witnesses testified they observed seepage in varying amounts at the base of the levee the day and the evening before the levee failed. Raab, and the district's superintendent, James Byrd, testified they observed no such seepage.

The precise cause of the levee failure seems uncertain. Raab testified he did not know what caused it, but that it might have been a deep-seated foundation failure. Engineers produced by plaintiffs as expert witnesses testified it might have been caused by seepage undermining the levee, by instability created by removing material from the base or "toe" of the land side of the levee, or by vibration caused by the use of heavy equipment on the levee. They testified it was not good engineering practice to excavate near the toe of the levee, nor was it good engineering practice to raise the levee three or four feet in a few days, each of which was done in this case.

At the time of the flood plaintiff Bruna Galli was the owner of an approximate 100-acre parcel of land used for row crops, a home site, equipment shed and a garage. Most of the land was planted to crops at the time of the flood and these crops were destroyed. The residence was occupied by tenants and it and the other structures were destroyed. The water was on the property for several weeks. Bruna Galli received a

nonrepayable federal disaster grant of $5,000 to replace improvements, and additional financial assistance to repair the damage to crop land and irrigation facilities. The farm shed was replaced but no residence was rebuilt on the property.

In addition to the loss of crops and improvements, Bruna Galli sought damages for loss of farm equipment and other personal property on the premises.

Plaintiffs Richard and Marjorie Gemignani were the owners of residential property outside the town of Isleton on Tyler Island Bridge Road. Richard Gemignani was engaged in farming the Bruna Galli property and other property on the island. At the time of the flood the Gemignanis were able to remove part of their personal property. The improvements on the Tyler Island Bridge Road property were badly damaged but not completely destroyed. The Gemignanis received a federal disaster loan of $23,150, of which $5,000 was not repayable, and the balance repayable at low interest, to replace their home and the personal property which was lost. The Gemignanis testified that after the flood they were reluctant to return to Brannan-Andrus Island to live because they feared future flooding, and although Mr. Gemignani wanted to be near the property he was farming they did not want to relocate either in the part of Isleton that had not flooded or in Rio Vista because they did not want to live in town. They were denied a lot-split by the county on property on Grand Island which they had sought to purchase, and since they knew of no other property suitable to their wants they purchased a mobile home and situated it on family-owned property on Grand Island.

In addition to the loss of a portion of the crops on the Galli property, the Gamignanis sought damages for the injury to their interest in real property, for the loss of personal property which had not been removed, and for the loss of value of personal property which had been saved but was claimed to be no longer useful to them. They also sought recovery for the expense of removing and temporarily storing personal property, for the cost of temporary housing, and for emotional distress of Mrs. Gemignani.

In addition to prejudgment interest on those items of loss includable in an inverse condemnation case, plaintiffs Galli and Gemignanis sought damages for the effects of inflation on their losses, at the rate of some 8 to 9 percent a year since the date of the flood.

Over the state's objection, the trial court allowed testimony as to the rate of inflation and allowed it to be considered as an item of damages.

The jury awarded damages to Bruna Galli and the Gemignanis for damages to real property, personal property and growing crops. A specific item for inflation was added to each award. The jury also awarded minimal damages of $25 to Marjorie Gemignani for emotional distress. Over objections of plaintiff's counsel, the court instructed the jury to deduct from plaintiffs' damages all disaster benefits received by them which they do not have to repay. Although the verdicts and judgment do not specifically show such deductions, it is presumed they were made before making the total property damage award of $26,289 to Bruna Galli, and the total property damage award of $38,500 to the Gemignanis.

I

The state contends the Brannan-Andrus Levee Maintenance District is a local public agency or entity and not a state agency, and as such the state is not liable for acts or omissions of the district. We agree. The trial court erred as a matter of law in determining the district to be "an agency of the State of California."

Prior to the creation of the Brannan-Andrus Levee Maintenance District in 1967, certain levees, among them the one which failed, had been maintained on Brannan-Andrus Island by three reclamation districts— Reclamation Districts Nos. 317, 2067 and 407. Levee maintenance had become a cause of concern to the local property owners, since raising sufficient money had been difficult. The Legislature directed a study by the State Reclamation Board which resulted in recommended legislation to create a new district in addition to the three existing Reclamation Districts. (Stats. 1965, res. ch. 227, p. 5426.) In 1967, the Legislature created the Brannan-Andrus Levee Maintenance District. (Stats. 1967, ch. 910; Stats. 1969, ch. 257; West's Ann. Wat. Code - Appen., §§ 106-1 to 106-17.) As previously explained, it was this district which was working on the levee at the time of its failure.

The legislative act established a district consisting of territory within existing Reclamation Districts Nos. 317, 407 and 2067. (§ 4.) In the usual manner of such districts, an elective governing board of directors

was provided. (§§ 5, 6, 7, 8.) The purposes and powers of the district were succinctly stated to be "to improve, repair, operate, maintain, construct and reconstruct the levees, works, structures, or other facilities that provide flood control and flood protection [to its area], and including the right to give such assurances and to assume such liability as may be required of a *local agency* engaged in the maintenance of flood control levees." (§ 9.) (Italics added.)

The district was given by cross-reference all the general powers and authority of a reclamation district under the water code and other laws of the state. (§ 10.) These included powers of condemnation of property, purchase of property, levying of assessments and issuing bonds. (Wat. Code, § 50000 et seq.)

Since the jury returned a special verdict, on the inverse condemnation issue, that the state was not liable for "substantial participation" with the district in inverse condemnation, we are confronted with a question confined within the parameters of whether the district, as a matter of law, is a part of the state government. We have concluded it is not.

The trial court, in ruling the district a "state agency" for purposes of liability of the state placed heavy reliance on the case of *Reclamation District No. 551* v. *County of Sacramento* (1901) 134 Cal. 477 [66 P. 668], which the trial court indicated stood for the proposition that the whole scheme of reclamation originates with the state and is carried to conclusion by agents of the state, and reclamation districts (like the district in this case) are agencies of the state in furtherance of such schemes or policies. However, the cited case did not stand for liability of the state for torts or inverse condemnation of the district. It merely held the property of the reclamation district was exempt from taxation under provisions of the California Constitution exempting public property, since the lands had been procured by a public agency acting as an agent of the state for state purposes. (*Id.*, at p. 479.)

There are other cases holding that districts formed for purposes of drainage, irrigation, reclamation and flood control are different and distinct from districts formed for schools or other public purposes. (See, e.g., *Gonzales* v. *State of California* (1972) 29 Cal.App.3d 585, 590 [105 Cal.Rptr. 804]; *In re Orosi Public Utility Dist.* (1925) 196 Cal. 43, 52-53 [235 P. 1004].) Most of the cases involving reclamation and similar water districts make it clear they are carrying out state policy in

performing work for flood control and reclamation. (See, e.g., *People* v. *Reclamation Dist. No. 551* (1897) 117 Cal. 114, 121 [48 P. 1016], saying they are "special organizations;" see, also *Knights Landing Ridge Drainage District* v. *Reclamation District No. 730* (1934) 1 Cal.2d 350, 352 [34 P.2d 1017].)

Plaintiffs emphasize particularly the case of *Western Assur. Co.* v. *Drainage Dist.* (1925) 72 Cal.App. 68, 74 [237 P. 59], in which the court applied the then-existing sovereign immunity of the state in favor of a drainage district, saying the district was an agency of the state.[2] Other cases[3] have pointed out that what plaintiffs refer to as these "unusual organizations" (irrigation districts and reclamation districts) have been variously defined by the courts for various purposes as public corporations for governmental purposes and as agencies of the state, and as such are not liable for torts of their own agents or employees since they are performing a governmental function. (See *Morrison* v. *Smith Bros., Inc.* (1930) 211 Cal. 36, 40-41 [293 P. 53], and cases collected therein.)

None of the cases cited by plaintiffs, and none that we have found, either pre-*Muskopf* or post-*Muskopf,* has held the state liable on a "state agency" theory for injuries caused by a reclamation or irrigation district, or other water district, in *maintenance* of its works under either a theory of inverse condemnation or tort. Nor has any case held to the contrary, insofar as we are aware.

There is no inconsistency in finding that for many purposes a local district can be considered a state agency, as contrasted to a municipal corporation or private entity, but that such characterization does not dictate state government and the general taxpayers of the state are responsible for the torts or inverse condemnation of a district under circumstances now before us.

The relationship between these local districts, with their limited territorial jurisdiction, and the state as a statewide geographical entity was early recognized by the Supreme Court in the case of *People* v. *Sacramento Drainage Dist.* (1909) 155 Cal. 373, 379-380 [103 P. 207], wherein the court said, in part: "[T]he specific lands thus reclaimed

---

[2]This case arose prior to *Muskopf* v. *Corning Hospital Dist.* (1961) 55 Cal.2d 211 [11 Cal.Rptr. 89, 359 P.2d 457].

[3]Also pre-*Muskopf.*

would be especially benefited by their enhanced and assured productiveness, and it was proper that such lands should bear the cost of the work of reclamation proportioned to the benefits which they would receive. Such being the condition, levee districts, drainage districts, and reclamation districts came into existence, some by special legislative enactment, others under general and permissive laws." (See, as to reclamation districts in general, 2 Rogers & Nichols, Water for California (1967) §§ 656-660, pp. 243-247.)

The district was given jurisdiction only over the levees, work structures, or other facilities of Reclamation Districts Nos. 317, 407, and 2067, and including the right to "give such assurances and to assume such liability as may be required of a local agency engaged in the maintenance of flood control levees." (West's Wat. Code, appen., § 106-9.) Consistent with the limitations of its purposes, this district was given all the powers of a reclamation district as provided by section 50000 et seq. of the Water Code. (West's Wat. Code, Appen., § 106-10.)

The district is governed by a locally elected board of directors. (§ 7.) Eligibility to vote is limited to a landowner or his legal representative. (§ 7; Wat. Code, § 50602, 50016, 50704.) The district may sue and be sued. (Wat. Code, § 50603; Gov. Code, §§ 945, 811.2.) The act provides details of government of the district, including taxation, development and carrying out of projects, and issuance of bonds. (Wat. Code, §§ 50932, 50910, 50950, 50951, 51200-51204, 51400, 52201, 52203.) It may levy assessments on land *owned by the state*. (Wat. Code, §§ 51200-51204, 51230, 51231, 51300, 51321.)

To base liability of the state on a theory, as advanced by plaintiffs, that the district either is a "state agency" or, in effect, is the state itself, extends liability under the modern theories of the Tort Claims Act beyond rational limits.

The enactment of the California Tort Claims Act (tit. 1, div. 3.6, commencing with Gov. Code, § 810) after the decision in *Muskopf* v. *Corning Hospital Dist.* (1961) 55 Cal.2d 211 [11 Cal.Rptr. 89, 359 P.2d 457], restored sovereign immunity except as provided in that act or other statute. (*Williams* v. *Horvath* (1976) 16 Cal.3d 834, 838 [129 Cal.Rptr. 453, 548 P.2d 1125].) ■ As stated in *Williams*, "[T]he intent of the act is not to expand the rights of plaintiffs in suits against governmental entities, but to confine potential governmental liability to

rigidly delineated circumstances . . . ." (*Ibid.;* see also *Moncur* v. *City of Los Angeles* (1977) 68 Cal.App.3d 118, 122 [137 Cal.Rptr. 239]; *Susman* v. *City of Los Angeles* (1969) 269 Cal.App.2d 803, 808 [75 Cal.Rptr. 240].)

█ The Tort Claims Act clearly distinguishes between the state and local public entities. The "State" is defined as "the State and any office, officer, department, division, bureau, board, commission or agency of the State claims against which are paid by warrants drawn by the Controller." (Gov. Code, §§ 900.6, 940.6.) A "Local public entity" is defined to include "a county, city, district, public authority, public agency, and any other political subdivision or public corporation in the State, but does not include the State." (Gov. Code, §§ 900.4, 940.4.)

Separate provisions for the state and local public entities govern most aspects of filing claims, bringing actions, and obtaining payment of judgments under the Tort Claims Act. They include provisions relating to required presentation of claims (Gov. Code, § 905, local public entities; §§ 905.2 and 905.4, state); action on claims (§ 912.6, local public entities; § 912.8, state); delivery of claims and applications (§ 915, subd. (a), local public entities; § 915, subd. (b), state); claims procedures established by agreement (§ 930.2, local public entities; § 930, state); settlement or compromise of actions (§ 949, local public entities; § 948, state); and payment of claims and judgments (§§ 970-978.8, local public entities; § 965-965.4, state).

There are special provisions applicable only to local public entities relating to regulation of the procedure for presenting claims not included within section 905 (§§ 935, 935.2, and 935.4), to certain actions against local public entities (§§ 960-960.8), and to obtaining liability insurance (§§ 989-991.2).

There are also special provisions applicable only to the state relating to presentation of claims to the State Board of Control (§§ 925-926.10), to proceedings to determine the constitutionality of claims against the state (§§ 920-920.8), to authority for a state agency to adjust and pay claims (§ 935.6), and to venue, service of process, and execution on judgments against the state (§§ 955-955.8).

The evidence is undisputed that claims against the Brannan-Andrus Levee Maintenance District are not paid by warrants drawn by the

State Controller, and thus the district is not the "state" as defined in the Tort Claims Act. The state requests the court to take judicial notice that the district has filed the statement required of entities other than the state, a city, county, or a city and county, pursuant to section 53051 of the Government Code, for the Roster of Public Agencies maintained by the Secretary of State's office. We have done so. (A copy of Deputy Secretary of State Rosemary Machado's declaration to that effect is on file in this court as part of exhibit G, petition for writ of mandate, Galli v. Superior Court, 3 Civ. 16308.)

Claims which must be brought against a local public entity must be presented to the governing body of that entity. (Gov. Code, §§ 905, 915.) Entities other than the state, a city, county, or city and county, must file a statement giving information relating to the entity with the California Secretary of State, which is contained in the Roster of Public Agencies. (Gov. Code, §§ 53050, 53051.) As noted above, the Brannan-Andrus Levee Maintenance District has filed such a statement.

The local public entity's governing board may grant, deny, or grant in part and deny in part any such claims. (Gov. Code, § 912.6.)

A local public entity is liable, with certain specified exceptions, for the torts of its directors, officers, and employees and for injuries resulting from a dangerous condition of its property. (Gov. Code, §§ 810.2, 810.4, 810.8, 811.2, 811.4, 815, 815.2, 815.4, 830, 835.)

A local public entity is required to pay any judgment, compromise, or settlement arising from a claim against its public employees if the claims arose out of any act or omission occurring within the scope of the employee's employment and not out of actual malice, corruption, or actual fraud, and the employee requests that the entity defend him. (Gov. Code, § 825.) The entity is required to provide the employee a defense, under the same circumstances. (Gov. Code, § 995.)

A local public entity may purchase insurance against all or any part of any tort or inverse condemnation liability. (Gov. Code, § 990.)

A local entity is required to pay judgments in tort and inverse condemnation against it and a writ of mandate may be obtained to compel payment. (Gov. Code, §§ 970, 970.2.) The entity may levy taxes or assessments to obtain funds to pay judgments, or may fund such judgments with bonds. (Gov. Code, §§ 970.8, 975.2 et seq.)

The legislative intent that local public entities pay their own judgments in tort and inverse condemnation was further evidenced in the 1975 amendments to chapter 2, part 5, of division 3.6 of the Government Code (§§ 970-971.2) relating to payment of judgments against local public entities. Before the 1975 amendments the reference in these code sections was to "tort judgments." The purpose of the substitution of "judgment" for "tort judgment," according to the Law Revision Commission comment accompanying this amendment was "to make clear that Article 1 (commencing with Section 970) applies to inverse condemnation judgments." (12 Cal. Law Revision Com. Rep. (1974) pp. 582-586.) According to the Law Revision Commission recommendation this amendment "will make clear that local public entities have a duty to pay inverse condemnation judgments and will make applicable to such judgments the provisions relating to the manner of paying tort judgments, including the provision permitting the payment of such judgments in not more than 10 annual installments." (*Op. cit. supra,* at p. 580.)

There are no provisions in the Tort Claims Act creating liability of the state for the acts or omissions of a local public entity, or for the payment by the state of a judgment against a local public entity, except for provisions pertaining to liability under a joint powers agreement pursuant to sections 895-895.8 of the Government Code. No such agreement was pleaded or proven. On the contrary, although plaintiffs argued a wide range of activities as constituting participation by the state in the district's work the jury expressly found no substantial participation on the part of the state.

█ The courts have made it plain that the intent of the Tort Claims Act was to modify the common law of governmental tort liability and classify types of public agencies in a manner that they need not be "...exposed to identical tort responsibility...." (*Flournoy* v. *State of California* (1964) 230 Cal.App.2d 520, 524 [41 Cal.Rptr. 190].)

█ Our understanding of the various cases and statutes involved, is not inconsistent with what we view to be sound public policy. It would not be unjust or inequitable that the district alone bear the cost of damage it causes, unless the state is also liable on grounds other than we have so far discussed. Plaintiffs are property owners within the district, and thus district electors. The directors of the district are landowners

initially appointed by the local reclamation districts and the county board of supervisors and who thereafter stand for election by the real property owners in the district. The board of directors of the district, and not the state, determines the tax rate for raising funds for the district, determines the amount of money they wish to spend on any given work, hires and supervises the engineer and workmen who do the work, and selects from the several alternatives the method of work the district will employ. Although the district could have raised funds at the rate of $1.50 per $100 of assessed valuation, and some 70 percent of its tax base is in corporate mineral rights and not individual landowner's holdings, the tax rate it used was less than $1. One of the primary interests the district had in determining how it would accomplish its maintenance and repair work was keeping the cost as low as possible. For a relatively small additional amount of money the district could have utilized a method of repairing its levee which did not involve borrowing material from the area adjacent to the inside of the levee. No state funds were used and no employee of the state planned, designed, performed, inspected, supervised or approved the work in question.

The district board was authorized to and did act upon the plaintiffs' claims in these actions without supervision or control of the state. (Gov. Code, § 912.6.) The district was represented in these actions by its own counsel, and separately entered into a settlement agreement with the plaintiffs. Also without any control by the state, the district has allowed the judgment entered against it in the trial court to become final.

Based on the foregoing, we hold the Brannan-Andrus Levee Maintenance District is responsible for its torts and for inverse condemnation. The State of California is not liable for acts and omissions of the district, and the district is not an agency of the state for purposes of liability under the facts and circumstances of this case.[4]

---

[4]Plaintiffs attempt on appeal to argue liability of the state on grounds the state owned the levee, which is merely held by the district for governmental purposes as trustee of the state, and the property was allegedly in dangerous condition. However, this argument is foreclosed since the trial court submitted to the jury this question of dangerous condition of property, the underlying title to which is in the state. The jury rendered a special verdict the state was not liable based on maintenance of its property in a dangerous condition. Plaintiffs have not appealed from the liability portion of the judgment, which of course was in their favor. This issue is thus not cognizable on appeal. (See 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 121, pp. 4118-4119.) Nonetheless, we shall consider the matter of land ownership.

## II

The state contends it was not under a mandatory duty (as found by the trial court) to review and approve or disapprove the plan of work of the district.

Based principally upon Water Code section 8710 and Government Code section 815.6, the trial court ruled as a matter of law that the state had a "mandatory duty" to review and approve or disapprove the plan of work used by the district. The jury was so instructed, over objection, leaving for their determination only the question of proximate cause.

We agree with the state that this was an error of law on the part of the trial court.

Section 8710 of the Water Code provides as follows: "Every plan of reclamation, flood control, drainage, improvement, dredging or work, that includes or contemplates the construction, enlargement, revetment or alteration of any levee, embankment, canal or other excavation in the bed of or along or near the banks of the Sacramento or San Joaquin Rivers or any of their tributaries or connected therewith, or upon any land adjacent thereto, or within any of the overflow basins thereof, or upon any land susceptible to overflow therefrom, shall be approved by the [reclamation] board before construction is commenced." Section 815.6 of the Government Code, part of the Tort Claims Act, provides as follows: "Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty."

No formal application for approval of a plan was made by the district to the reclamation board. Albert E. McCollam, Chief Engineer and General Manager of the State Reclamation Board, testified it was not the board's policy that the local districts required its approval for maintenance work. Raab testified he had delivered a profile of the district's proposed plans for work intended to be done in 1968 to McCollam and they discussed them briefly. During the course of the levee restoration work, McCollam was taken with some other state and federal officials

to look at the levees from the river side, in a boat trip. No state official or agency was involved in planning, designing, financing, performing, supervising, inspecting, or approving the levee work being done by the district. It was generally understood by both district and reclamation board officials that repair and maintenance of "nonproject" levees was solely the responsibility of the local district.

The levee in question has never been part of a state or federal-state project. Levees in the delta are classified into three general categories: project levees, direct agreement levees, and nonproject levees. A project levee is one within a flood control project which has been authorized by the Legislature either alone or in conjunction with the federal government. (See Wat. Code, §§ 12639-12751.) Direct agreement levees are levees maintained to federal standards by local interests in direct agreement with and under the supervision of the United States Army Corps of Engineers. Levees along the Stockton Deep-Water Channel, modified as part of construction of that channel, and also levees that are repaired by the corps of engineers following major failure, are direct agreement levees. All other levees are nonproject levees. In the area described as the Sacramento-San Joaquin Delta (Wat. Code, § 12220), approximately 15 percent of the levees are project levees, 10 percent are direct agreement levees and the remaining 75 percent are nonproject levees. On Brannan-Andrus Island, the levees on the Sacramento River and on Georgiana and Three-Mile Slough are project levees, part of the Sacramento River Flood Control project. The levees on the Mokelumne and San Joaquin Rivers and on Seven-Mile Slough are nonproject levees. The pertinent levee on the San Joaquin River in addition to being a nonproject levee is also a direct agreement levee as a result of agreements between the Stockton Port District and the corps of engineers relating to the Stockton Deep Water Channel.

Project levees are designed to protect against high-water flows coming through the Sacramento River system during heavy runoff periods. The nonproject levees in the central delta, including the levee in this case on the San Joaquin River which failed, primarily serve the function of protecting against daily tidal fluctuations. The channels in the central delta have little downstream slope or gradient. Hence, they create a large pool in which the fluctuations due to river runoff are generally less significant than the fluctuations caused by tides. The Sacramento River project levees were designed to carry the increased flows within the leveed channels caused by upstream flood control works

which contain and channel flood waters that formerly spread over large areas. The effect of such leveeing and control of flood waters by the project is dissipated when the waters empty into the delta pools and thus project levees are not necessary in the central delta as a consequence of the operation of the project.

For federal-state flood control projects, such as the Sacramento River Flood Control Project, the state has assured the federal government that project works will be operated and maintained in accordance with federal standards. The maintenance of project levees, with certain exceptions, is the responsibility of the local districts. (Wat. Code, § 8370.) Project construction is the responsibility of the federal government, while the state provides the necessary land and rights of way and utilities relocations, and inspects project levee maintenance. To obtain federal participation the state has agreed to assure the federal government that the constructed projects works would be properly maintained. If maintenance of the project levees is not adequately performed by the district responsible, a maintenance area may be formed and the maintenance work performed by the state, and the property owners within the area assessed to provide funds to carry out the maintenance obligation. (Wat. Code, §§ 12878-12878.45.) This authority applies only to project levees, not to nonproject levees. (Wat. Code, §§ 12878, 12878.21.)

Project levee inspections are carried out by state personnel twice a year to see if the project levees are being maintained to the required federal standards. Nonproject levees are not inspected by the state nor are they required to be maintained to state or federal standards.

Maintaining the grade of a sinking levee, as was being done in this case, even though it might require what appears to be "construction," is considered a "maintenance" function under both state and federal descriptions of levee maintenance. (See 33 C.F.R., § 208.10 (b) (i) (1979); DWR Bull. 149-71, p. 8.)

The present provisions of section 8710 and following, held by the trial court to create a mandatory duty on the part of the reclamation board, are essentially the same as the provisions enacted in the Reclamation Board Act in 1913 and 1915 (cf. Stats. 1915, ch. 686, §§ 5, 8, and Wat. Code, §§ 8710-8723). Accordingly, a brief review of the historical functioning of the State Reclamation Board and local reclamation and other levee maintaining districts is appropriate in interpreting those provisions.

Before the creation of the State Reclamation Board in 1911 (Stats. 1911, Ex. Sess., ch. 25), local reclamation districts had constructed and maintained levees for many years. For example, on Andrus Island the district which built the levee on the San Joaquin River was formed in approximately 1872. Its successor district, Reclamation District No. 317, was created in 1878 and is still in existence.

In 1917, the review and approval authority of the reclamation board, as it applied specifically to reclamation districts, was incorporated in the Reclamation District Act by amendment of section 3455 of the former Political Code. (Stats. 1917, ch. 671, § 7.)

Those provisions are essentially the same as the present sections 51020 through 51030 of the Water Code. With respect to levee construction or reconstruction, the reclamation board approval requirement applied then as now, only to original and amendatory, supplemental, or additional plans of reclamation proposed by the district. (Stats. 1917, ch. 671, § 7; Wat. Code, §§ 51020, 51029.)

The question whether a reclamation district was required to have reclamation board approval of maintenance and repair of existing reclamation works was raised before the California Supreme Court in *Reclamation Dist. No. 1619* v. *Dodge* (1938) 10 Cal.2d 743 [76 P.2d 679]. In that case the district was seeking to fund the maintenance and repair of its reclamation works by issuing bonds. Although the district had complied with all the provisions of the Reclamation District Act for the issuance of bonds, the county treasurer refused to publish notice of sale and to sell the bonds on the ground that the district had not submitted its plan of work to the reclamation board for approval. The court found that the funds sought by the district were for operation and maintenance purposes and held that no approval of the proposed work by the reclamation board was required. (*Id.* at p. 747.)

Further statutory indication that maintenance and repair work by districts does not require prior reclamation board approval is found in the Water Code provisions for raising and using funds for operation and maintenance of reclamation works. To assess and obtain funds for an original or an amendatory, supplemental, or additional plan of reclamation, a reclamation district within the area of jurisdiction of the reclamation board is required to submit its proposed plan of work to the reclamation board for approval. (Wat. Code, §§ 51020-51029.) How-

ever, to assess for purposes of operating, maintaining, or repairing reclamation works, no plan of work is required to be submitted to either the reclamation board or the county board of supervisors. When an operation and maintenance assessment roll is prepared under the procedure of Water Code section 51320 and those following, the funds raised may be used for "the maintenance, repair and operation of the district reclamation works, the payment of incidental expenses thereof, and for the construction of reclamation works supplemental to, or in replacement of, those already possessed, when in the opinion of the [district] board, such works are necessary for carrying out the original or any supplemental plan of the district." (Wat. Code, § 51326.)

Had the Legislature intended that the reclamation board review and approve plans of maintenance and repair work of reclamation districts as it does original and amendatory, supplemental, and additional plans of reclamation, provisions requiring such review and approval presumably would have been included in the statutes pertaining to reclamation districts.

Jess E. Marks, a director on the Brannan-Andrus Levee Maintenance District Board, and also a plaintiff in the action, testified that to his knowledge there was no requirement that the reclamation board either be advised of the plan of work of the district or give its approval.

The Brannan-Andrus Levee Maintenance District, in answers to interrogatories, stated that it was not required to follow any State of California directives, recommendations or guides in maintaining or altering its nonproject levees, and that it did not obtain reclamation board approval for the 1972 work.

Albert E. McCollam, who was general manager and chief engineer for the State Reclamation Board from 1962 to 1975, testified that it was his understanding the Brannan-Andrus Levee Maintenance District had been created for the purpose of repairing and maintaining the levees on most of the island and that, although he had no specific knowledge of the plan of work, he understood that the work being done by the district was to restore and maintain levees which had deteriorated, and not for the purpose of carrying out a new or supplemental plan of reclamation. No reclamation board approval was contemplated or required for this type of work in his view. He believed the purpose of the regulatory authority given the reclamation board was to control random

levee construction that could interfere with or injure state-adopted flood control plans. At the time this authority was created, levees were being built "willy-nilly, all over the place. People were cutting levees, people were blasting each other's levees and there was a hodgepodge of work going on. . . ." McCollam testified, similarly to Raab, that placing encroachments on or through a levee, such as a pump or siphon, whether done by an individual or a district, came under the review provisions of section 8710, and following, of the Water Code. He said that ongoing maintenance of the levees, on the other hand, is the responsibility of the districts and under their control. There are some 50 reclamation districts in the central delta alone, and the placing of additional material on the subsiding levees to maintain a certain grade is a continuing necessity and carried out almost every year. McCollam testified the reclamation board never considered it a requirement that the districts submit plans and obtain approval of the work. There was no contrary specific testimony as to the board's interpretation of the organic laws it worked under.

■ "The contemporaneous construction of a statute by those charged with its enforcement and interpretation, although not necessarily, controlling, 'is entitled to great weight, and courts generally will not depart from such construction unless it is clearly erroneous or unauthorized.'" (*Meyer v. Board of Trustees* (1961) 195 Cal.App.2d 420, 431 [15 Cal.Rptr. 717].) "Consistent administrative construction of a statute over many years, particularly when it originated with those charged with putting the statutory machinery into effect, is entitled to great weight and will not be overturned unless clearly erroneous." (*DiGiorgio Fruit Corp.* v. *Dept. of Employment* (1961) 56 Cal.2d 54, 61-62 [13 Cal.Rptr. 663, 362 P.2d 487]; see also *Rivera v. City of Fresno* (1971) 6 Cal.3d 132, 140 [98 Cal.Rptr. 281, 490 P.2d 793]; *REA Enterprises* v. *California Coastal Zone Conservation Com.* (1975) 52 Cal.App.3d 596, 611 [125 Cal.Rptr. 201].)

■ The construction placed on the statutes by the reclamation board and by the state on this appeal is consistent with the differing functions and responsibilities which we perceive were given by the Legislature to the reclamation board and the reclamation districts. The districts had responsibility for the ongoing maintenance and operation of their reclamation works, and the reclamation board had the responsibility to see that reclamation works were not planned and constructed which would be harmful to state-adopted flood control projects.

Legislation subsequent to the 1972 flood confirms that the reclamation board had not previously been intended to review plans of maintenance on nonproject levees. In September of 1972, pursuant to Senate Resolution 68, the Senate Committee on Agricultural and Water Resources held a hearing on the Brannan-Andrus Island flood. The committee chairman, Senator Howard Way, subsequently authored legislation which added part 9 (beginning with § 12980) to division 6 of the Water Code, entitled "Delta Levee Maintenance." (Stats. 1973, ch. 717.) We shall refer to this legislation hereafter as the "Way Bill." In the "Way Bill" the Legislature found and declared that the state has an interest in providing "technical and financial assistance for delta levee maintenance and rehabilitation" (Wat. Code, § 12983), and directed the State Department of Water Resources to develop and submit to the reclamation board criteria for the maintenance and improvement of *nonproject* levees in the delta. (Wat. Code, §§ 12984, 12980.) Prior to adoption of any such criteria the reclamation board was required to hold public hearings. (Wat. Code, § 12985.) Once the criteria were developed and adopted, "local agencies" (defined in Wat. Code, § 12980 as any city, county, district, or other political subdivision of the state which is authorized to maintain levees) may become eligible for reimbursement of part of their levee maintenance and rehabilitation costs, after submission to and approval by the reclamation board of plans for the maintenance and improvement of their nonproject levees in conformance with the adopted criteria. (Wat. Code, § 12987.) Annual levee inspections by the Department of Water Resources is required. (Wat. Code, §12989.)

On the other hand, under the review procedure followed for applications submitted under section 8710, and following, of the Water Code, the practice is for a proposed plan for work to be reviewed by the corps of engineers and the State Department of Water Resources for their comments and recommendations. Their review is based on the technical aspects of the proposed work and requires criteria having already been developed. The development and administrative interpretation of the statutes which we have traced makes it plain to us the Legislature recognized in the "Way Bill" that local agencies were not receiving technical assistance for delta levee maintenance under existing law and authorized state agencies by this enactment to develop criteria and to review and approve plans of maintenance of those levees.

It is further indicative of legislative intent that, contrary to the trial court's ruling that the reclamation board has a mandatory duty to re-

view and approve plans of levee maintenance and repair, participation in the "Way Bill" program itself by the local districts is optional, since there is no provision mandating participation. In order to obtain state assistance, the local agency must voluntarily apply and submit its plan of maintenance work, and the processing of those applications and receipt of assistance is expressly made conditional upon the amount of funds made available by the Legislature. (Wat. Code, § 12987.)

In short, the administrative construction of Water Code section 8710 and related provisions by the agency charged with administering them (the reclamation board) has been consistent with the purpose of the act by which the agency was created and the pertinent prior, contemporary, and subsequent regulatory provisions. As we read the record, neither the board nor the local districts through the approximate 60-year history of the board, before 1972, ever considered it the function of the board to review or oversee nonproject levee maintenance by the district. At no point until the enactment of the "Way Bill," after the levee failure in question, did the Legislature indicate the board should undertake such a function on behalf of the state.

The trial court indicated a belief that since a levee might be raised, widened, or altered beyond what may be necessary to restore the original levee, and at some point come within the requirements of Water Code section 8710, to construe those sections to require board approval in one case and not in another would result in an "undesireable subjectivity" on the part of the board. The court felt it would be an "absurd approach" to trigger the reclamation board's regulatory jurisdiction on the basis of the nature or type of work done on a levee. We disagree. The trial court's resulting ultimate conclusion that the statutes required the board to review *all* work on the levees is contrary to the separate statutory functions and responsibilities of the districts and the reclamation board.

This court as early as 1919 and the Supreme Court again in 1938 held not every modification or addition to reclamation works required reclamation board approval, and where no new or additional work of reclamation was contemplated which would materially affect the general plan, no approval of the reclamation board was required. (*Silva* v. *Reclamation Dist. No. 1001* (1919) 41 Cal.App. 326, 331 [182 P. 786]; *Reclamation Dist. No. 1619* v. *Dodge, supra,* 10 Cal.2d at p. 747.) The criterion for board review and approval, as stated in those decisions,

was whether the work would tend to nullify or defeat the purpose of obtaining "harmony and uniformity" among the various districts in the promotion of reclamation.

The reclamation board has long been given an express "discretion" to determine "how and when" the various provisions of statute with which the board was concerned may best be carried into effect. (Wat. Code, § 8576; Stats. 1923, ch. 378, § 5.)

The reclamation board was aware before 1972 that the Brannan-Andrus Levee Maintenance District was in the process of restoring its subsided levees. It was also aware the Legislature in directing the reclamation board to study the levee maintenance problem in Reclamation District No. 317 in 1965 indicated that such study was not to include "the construction of new levees or extension of existing levees" but was to be a study of levee maintenance. (Sen. Con. Res. No. 82, Stats. 1965, res. ch. 227, pp. 5426, 5427.) Furthermore, officials from the board had viewed portions of the levees that had been rebuilt.

The conclusion that the work was maintenance and restoration rather than a substantial modification that could affect the state-adopted flood control project was based on the board's knowledge of the need for levee repair and the observation of finished segments of the work.

The record leaves no doubt the reclamation board was within its discretion not to require review and approval of the district's detailed plan of work.

It is our view from a study of the statutes, their administrative interpretation over the years, and the case law, that the Legislature did not and does not intend to require the reclamation board to review and approve or disapprove all reclamation district (or other district) plans to *repair* and *maintain* all existing works.

It follows that (a) the state was under no mandatory duty to review and approve or disapprove the plan of work of the Brannan-Andrus Levee Maintenance District; and (b) the Brannan-Andrus Levee Maintenance District is a local public entity, independently responsible for its torts and inverse condemnation. Due to the absence of a mandatory duty under Water Code section 8710 (or any other provision of law) the state is without liability under Government Code section 815.6 for failure to discharge such a duty.

## III

There remains to be considered an "additional theory" upon which plaintiffs urge we should affirm this judgment. This is the theory the state "substantially participated in the work of public improvement."

The arguments advanced by plaintiffs to sustain this theory are that (a) the reclamation board knew of the maintenance problems with the levee in the old District No. 317 which became part of the new Brannan-Andrus Levee Maintenance District; (b) the state, in effect, accepted the maintenance work of the new district on theories including knowledge of what was being done and possible partial ownership of this levee, at least up to the high water mark; (c) the state would participate in the public benefit from the work; (d) the levee was an integral part of a comprehensive water resource development system under general control of the state; and (e) the state owned the land.

None of the above arguments suffice. Knowledge on the part of the reclamation board of the maintenance problems on the nonproject levee was insufficient for liability, as we have pointed out, even if the board attempted to advise the district as to its work. The cases cited by plaintiffs on "approval" or "acceptance" of public works are inapposite. (Cf. *Sheffet* v. *County of Los Angeles* (1970) 3 Cal.App.3d 720 [84 Cal.Rptr. 11]; *Frustuck* v. *City of Fairfax* (1963) 212 Cal.App.2d 345 [28 Cal.Rptr. 357]; *Blau* v.*City of Los Angeles* (1973) 32 Cal.App.3d 77 [107 Cal.Rptr. 727].) The state did not approve or accept the work here. Nonproject levees, while in a sense part of the statewide water control system, are not subject to the same direct control of the state as project levees and are maintained on a local basis. Being a part of a complex system of levees for both flood control and other purposes does not of itself determine liability for damages for failure of a given portion of a levee. The levee in question was not under the general control of the state insofar as maintenance was concerned. Ownership of the land underlying the levee and up to the high water mark on the water side of the levee was claimed by some witnesses to be in the state. However, the record is full of contradictions as to where title to the levee land actually resides, particularly above the high water mark on the water-ward side and as to the entire land-ward side of the levee. It appears that Sam Souza may have owned the levee land on the land-ward side of the levee at the site of the levee break where the excavation was being done by the district. At any rate, the judgment in this case is not

based upon ownership of land, either as a matter of law or fact. This court will not accede to plaintiffs' request that we *now* on appeal attempt to rest it on such a foundation, not only because of the weakness of the argument, but because we do not usurp the functions of a trial court.

Having concluded the judgment must be reversed for reasons we have explained, we do not reach issues of damages, costs and attorneys' fees raised by both the state and by plaintiffs.

The judgment against the state is reversed.

Puglia, P. J., and Kleaver, J.,* concurred.

A petition for a rehearing was denied December 12, 1979, and the petition of the plaintiffs and appellants for a hearing by the Supreme Court was denied January 24, 1980. Manuel J., did not participate therein. Bird, C. J., was of the opinion that the petition should be granted.

---

*Assigned by the Chairperson of the Judicial Council.